### In re BREAST IMPLANT LITIGATION.

#### No. 96–S–9260.

United States District Court,
D. Colorado.

June 3, 1998.

Patricia Jo Stone, Stone & Associates, P.C., Denver, CO, for plaintiffs.

Mary A. Wells, Wells, Anderson & Race LLC, Denver, CO, Russell O. Stewart, Faegre & Benson, Denver, CO, Joel W. Cantrick, Pendleton, Friedberg, Wilson, Hennessey & Meyer, P.C., Denver, CO, Robert Spencer, Montgomery Little & McGrew, Englewood, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

SPARR, District Judge.

Currently pending in this court are numerous silicone breast implant cases brought against various breast implant manufacturers. Plaintiffs seek damages for injuries they allege to have suffered from their silicone breast implants. Making claims under Colorado law for strict liability, negligence, and breach of warranty, Plaintiffs allege that their silicone breast prostheses have caused "auto-immune diseases" and have injured the Plaintiffs "in and about their body and extremities." As of this date, only the Plaintiffs in *Roberts v. Baxter*, Civil Action No. 91–S–923 and *Zelinger v. Baxter*, Civil Action No. 93–S–2762 have filed their designations of expert witnesses.

Numerous motions challenge the relevance and scientific reliability of the proffered testimony of the Plaintiffs' expert witnesses regarding a causal connection between silicone gel breast implants and "auto-immune" or systemic diseases. The expert witnesses proffered by Plaintiffs Roberts and Zelinger are Dr. Stuart S. Kassan, M.D.; Dr. Jack Klapper, M.D.; Dr. Daniel Hoffman, M.D.; Dr. Robert Guidoin, Ph.D.; and Dr. Pierre Blais, Ph.D. This opinion addresses the following motions made by Defendants Baxter Healthcare Corporation, Minnesota Mining and Manufacturing Co., Bristol–Myers Squibb Co., Natural Y Surgical Specialties, Inc., Medical Engineering Corp., Surgitek, Inc., and Aesthetech Corp. (hereinafter "Defendants"):

(1) the Defendants' Motion to Exclude General Causation Testimony and Brief in Support (Science Brief (filed June 2, 1997));

(2) the Defendants' Motion In Limine to Exclude Expert Testimony of Stuart Kassan, M.D. (filed June 2, 1997);

(3) the Defendants' Motion In Limine to Exclude Expert Testimony of Jack A. Klapper, M.D. (filed June 2, 1997);

(4) the Defendants' Motion In Limine to Exclude Expert Testimony of Daniel Hoffman, M.D. (filed June 2, 1997);

(5) the Defendants' Motion In Limine to Exclude Expert Testimony of Robert Guidoin, Ph.D. (filed June 2, 1997); and

(6) the Defendants' Motion In Limine to Exclude Expert Testimony of Pierre Blais, Ph.D. (filed June 2, 1997).[1]

The court has reviewed, *inter alia*, the motions, Plaintiffs' Brief in Opposition (filed July 15, 1997), Defendants' Reply Brief (filed August 8, 1997), the experts' reports, the voluminous exhibits, affidavits, scientific studies, and scientific articles, the parties' proposed findings of fact and conclusions of law (filed September 29, 1997), the supplemental deposition excerpt (filed September 29, 1997), Plaintiffs' seven notebooks of scientific studies (submitted September 8, 1997); Plaintiffs' Summary of Science Articles (filed October 1, 1997), Defendants' Response to Plaintiffs' Summary of Science Articles (filed October 15, 1997), Defendants' Supplemental Brief (filed January 21, 1998), Plaintiffs' Supplemental Brief (filed January 30, 1998), Plaintiffs' supplement (filed February 25, 1998), Defendants' Response (filed March 3, 1998), Defendants' supplement (filed March 11, 1998), Defendants' supplement (filed March 12, 1998), Defendants' supplement (filed May 1, 1998), Defendant's supplement (filed May 5, 1998), the entire case file, and the applicable law and is sufficiently advised in the premises.

## I. Standard of Review

■ The Federal Rules of Evidence govern the admission of expert scientific testimony in a federal trial.[2] *Daubert v. Merrell*

---

1. Defendants' Motion to Preclude Expert Testimony of Dr. Eric Westerman (filed May 30, 1997) and Defendants' Motion to Preclude Expert Testimony of Dr. Daniel Hoffman (filed May 30, 1997) were mooted by the stipulated dismissal of Civil Action Nos. 93–S–2764 and 94–S–1457.

2. It is clear to the court that Plaintiffs are offering scientific evidence through the testimony of their expert witnesses, as opposed to mere "skill-

or experience-based observation." *See Compton v. Subaru of America, Inc.*, 82 F.3d 1513 (10th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996), *reh'g denied*, —— U.S. ——, 117 S.Ct. 1022, 136 L.Ed.2d 897 (1997); *Carmichael v. Samyang Tire, Inc.*, 131 F.3d 1433, 1434–36 (11th Cir.1997), *pet. for cert. filed*, Mar. 23, 1998. Doctors Kassan, Klapper, and Hoffman are medical doctors offering their testimony about scientific and medical issues. Plaintiffs argue that these three doctors used

*Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Fed. R.Civ.P. 702, governing expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under the Rules, federal trial judges "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. The Plaintiffs have the burden of proving that the testimony of their expert witnesses is admissible pursuant to Fed. R.Evid. 702 and the standards set forth in *Daubert,* 509 U.S. at 579, 113 S.Ct. 2786, governing the admissibility of scientific evidence. *Daubert,* 43 F.3d 1311, 1316 (9th Cir.1995).

In applying Rule 702, the trial court has the responsibility of acting as a gatekeeper. *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786. "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786. "Neither the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the 'gatekeeper' duties that the Federal Rules impose...." *General Electric Co. v. Joiner,* — U.S. ——, ——, 118 S.Ct. 512, 520, 139 L.Ed.2d 508 (1997) (Breyer, J., concurring).

Under the first prong of the *Daubert* test for admissibility of expert testimony, "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. The trial court's obligation under Rule 702 and *Daubert* is to determine evidentiary reliability, that is, trustworthiness. 509 U.S. at 590 n. 9, 113 S.Ct. 2786. "In a case involving scientific evidence, evidentiary reliability will be based on scientific validity." *Daubert,* 509 U.S. at 590 n. 9, 113 S.Ct. 2786. "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786; *accord Summers v. Missouri Pacific Railroad System,* 132 F.3d 599, 603 (10th Cir.1997).

> [T]here are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past. We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learn-

---

specialized medical methodologies. Doctors Guidoin and Blais are Ph.D.s offering their testimony about biomaterials and their effect on the human body. These areas of testimony are clearly more than "general principles" and "experience." *See Compton,* 82 F.3d at 1519.

In addition, *Compton,* 82 F.3d at 1513, has been criticized for limiting application of *Daubert,* 509 U.S. at 579, 113 S.Ct. 2786, to "particu-

lar methodology or technique," *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 989–91 (5th Cir.1997) (citing *Cummins v. Lyle Industries,* 93 F.3d 362, 366–71 (7th Cir.1996) and *Peitzmeier v. Hennessy Indus., Inc.,* 97 F.3d 293, 296–98 (8th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 1552, 137 L.Ed.2d 701 (1997)); *but see Carmichael,* 131 F.3d at 1434–36; *McKendall v. Crown Control Corp.,* 122 F.3d 803, 806–07 (9th Cir.1997).

ing of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

*Daubert,* 509 U.S. at 596–97, 113 S.Ct. 2786.

The Supreme Court has provided some guidance for the task of determining scientific validity. *Daubert* sets forth several non-exhaustive factors to assist trial courts in determining whether a theory or technique constitutes "scientific knowledge" within the meaning of Rule 702, including whether the methodology, principles and reasoning underlying the proposed experts' opinions: (1) can be and have been empirically tested; (2) have been subjected to peer review and publication; (3) have a known or potential rate of error; and (4) have gained general acceptance in the relevant scientific community. 509 U.S. at 593–594, 113 S.Ct. 2786.

■ Rule 702's second prong concerns relevancy, or "fit." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. "[T]he scientific knowledge must be connected to the question at issue." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir.1994), *cert. denied sub nom., General Electric Company v. Ingram,* 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). The trial court "must ensure that the proposed expert testimony is 'relevant to the task at hand,' ... i.e., that it logically advances a material aspect of the proposing party's case." *Daubert,* 43 F.3d at 1315.[3] "[T]he standard for fit is higher than bare relevance." *In re Paoli,* 35 F.3d at 745. Scientific expert testimony introduces special dangers to the fact-finding process because it "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 (internal quotation marks and citation omitted). Therefore, federal judges must exclude proffered scientific evidence under Rule 702 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury. *Daubert,* 43 F.3d at 1321.

■ The trial court must also look to Fed. R.Civ.P. 703 in determining the admissibility of expert testimony. Rule 703 also contemplates that the court will play a role in the assessment of expert testimony offered to a jury. Rule 703 provides that expert opinions based on otherwise inadmissible evidence are to be admitted only if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." An expert's otherwise relevant opinion is only admissible under Rule 703 where the underlying data have sufficient probative force and reliability that a reasonable expert could base an opinion on them. *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir .1987); *see also In re: Agent Orange Product Liability Litig.,* 611 F.Supp. 1223 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).

At a minimum, the court must assess the reliability and the relevance of the proffered expert testimony by determining whether the expert has the requisite qualifications to render an opinion under Rule 702, whether the expert used appropriate methodology in arriving at his or her opinions, whether the expert relied on facts or data of a type reasonably relied upon by experts in the particular field, and whether the testimony is relevant, that is, "fits" the facts of the case.

II. Analysis

■ Plaintiffs assert tort claims for negligence and strict liability, as well as claims for breach of express and implied warranty. In Colorado, "[i]n order to prevail on a tort claim, a plaintiff must prove by a preponderance of the evidence that a defendant committed an act which caused an injury to that plaintiff." *Renaud v. Martin Marietta Corp.,* 749 F.Supp. 1545, 1551 (D.Colo.1990), *aff'd,* 972 F.2d 304 (10th Cir.1992). Plaintiffs premise many of their alleged injuries on the existence of various kinds of "atypical connective tissue disease" ("ACTD"). This "disease" allegedly manifests itself through a

---

**3.** The court is mindful that summary judgment issues are not now before it. The court is charged with determining the reliability of scientific evidence proffered by Plaintiffs. However, in evaluating the "fit" aspect of the *Daubert*

analysis, the court must look to the nature of the Plaintiffs' claims, and the evidence necessary to make a *prima facie* case. *Daubert,* supra, *In re Paoli,* 35 F.3d at 743.

"constellation" of symptoms and is allegedly caused by an autoimmune response to silicone from breast implants. Plaintiffs' claims implicate several areas of scientific study, including rheumatology, neurology, and epidemiology.

### A. General and Specific Causation

■ Causation in toxic tort cases is discussed in terms of general and specific causation. *See e.g., Raynor v. Merrell Pharmaceuticals, Inc.,* 104 F.3d 1371, 1376 (D.C.Cir. 1997). General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury.

■ In order to establish their claims, Plaintiffs "must show both general and specific causation—that is, that breast implants are capable of causing" the conditions complained of, and that "breast implants were the cause-in-fact" of the specific conditions. *Kelley v. American Heyer–Schulte Corp.,* 957 F.Supp. 873, 875 (W.D.Tex.1997), *appeal dismissed,* 139 F.3d 899, 1998 WL 127822 (5th Cir.1998); *see also Raynor,* 104 F.3d at 1376 (holding that specific causation evidence is irrelevant where there is no general causation evidence indicating that Bendectin causes birth defects); *Anderson v. Bristol–Myers Squibb Co.,* No. H–95–003, slip op. at 16–22 (S.D.Tex. April 20, 1998); *Hall v. Baxter Healthcare Corp.,* 947 F.Supp. 1387, 1412–13 (Courts "have recognized two levels of causation: general causation (i.e., can silicone gel cause disease in anyone?) and specific causation (i.e, did silicone gel breast implants cause disease in this plaintiff?)") (citations omitted); *Jones v. United States,* 933 F.Supp. 894, 900–01 (N.D.Cal.1996) (plaintiff must show both "general causation," that defendant's conduct increased likelihood of injury, and "specific causation," that defendant's conduct was probable, not merely possible, cause of injury), *aff'd,* 127 F.3d 1154 (9th Cir.1997); *Rutigliano v. Valley Business Forms,* 929 F.Supp. 779, 783 (D.N.J.1996) ("Plaintiff's case requires expert testimony to satisfy her burden with respect to both general causation and specific causation") (citations omitted), *aff'd,* 118 F.3d 1577 (3d Cir.1997); *In re Silicone Gel Breast Implants Products Liability Litig.,* 887 F.Supp.

1469, 1477 (N.D.Ala.1995) (noting distinction between general causation and specific causation); *Snyder v. The Upjohn Co.,* No. 94–1826–GHK at 8 (C.D.Cal. May 20, 1997) (the only possible specific causes "are those for which general causation has already been established").

### B. Epidemiology is the Best Evidence of Causation

The diseases and symptoms allegedly associated with breast implants occur in non-implanted women as well as implanted women. Many of the conditions that Plaintiffs attribute to breast implants appear in the general population. Without a controlled study, there is no way to determine if these symptoms are more common in women with silicone breast implants than women without implants. "The most important evidence relied upon by scientists to determine whether an agent (such as breast implants) cause disease is controlled epidemiologic studies. Epidemiology can be viewed as the study of the causes of diseases in humans." (Ory Affidavit, Exhibit A p. 7 to Defendants' June 2, 1997 Science Brief). Therefore, epidemiological studies are necessary to determine the cause and effect between breast implants and allegedly associated diseases. A valid epidemiologic study requires that study subjects, cases, and controls are chosen by an unbiased sampling method from a definable population. Epidemiology is the best evidence of causation in the mass torts context. Linda A. Bailey, et al., *Reference Guide on Epidemiology,* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 126 (1994) ("In the absence of an understanding of the biological and pathological mechanisms by which disease develops, epidemiological evidence is the most valid type of scientific evidence of toxic causation") (citations omitted); *see also Raynor,* 104 F.3d at 1376 (non-epidemiological studies, "singly or in combination," were "not capable of proving causation in human beings in the face of the overwhelming body of contradictory epidemiological evidence") (citations omitted); *Allen v. Pennsylvania Engineering Corp.,* 102 F.3d 194, 197 (5th Cir.1996) (affirming exclusion of plaintiffs' non-epidemiological causation evidence because "the most useful and conclu-

sive type of evidence in a case such as this is epidemiological studies"); *Elkins v. Richardson–Merrell,* 8 F.3d 1068, 1073 (6th Cir.1993) (affirming summary judgment where plaintiff failed to raise a genuine issue of fact regarding causation in light of epidemiological evidence), *cert. denied,* 510 U.S. 1193, 114 S.Ct. 1299, 127 L.Ed.2d 651 (1994); *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 311 (5th Cir.) ("the most useful and conclusive type of evidence in a case such as this is epidemiological studies"), *modified,* 884 F.2d 166 (1989), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990); *Lynch v. Merrell–National Laboratories,* 830 F.2d 1190, 1193–97 (1st Cir.1987) (affirming summary judgment for Bendectin manufacturer where plaintiff offered only criticism of defendant's epidemiological evidence with no epidemiological evidence of its own); *Hall,* 947 F.Supp. at 1403 ("[t]he existence or nonexistence of relevant epidemiology can be a significant factor in proving general causation in toxic tort cases") (citations omitted); *Conde v. Velsicol Chem. Corp.,* 804 F.Supp. 972, 1025–26 (S.D.Ohio 1992) ("[e]pidemiologic studies are the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease"), *aff'd,* 24 F.3d 809 (6th Cir.1994); *In re Agent Orange Product Liability Litigation,* 611 F.Supp. at 1231 ("[a] number of sound epidemiological studies have been conducted on the health effects of exposure to Agent Orange. These are the only useful studies having any bearing on causation").

The Tenth Circuit has cited with approval several pre-*Daubert* Bendectin cases recognizing the primacy of epidemiological evidence. *Wilson v. Merrell Dow Pharmaceuticals, Inc.,* 893 F.2d 1149, 1154 (10th Cir. 1990) ("This lack of epidemiological proof for the Wilsons' claims is particularly significant in light of recent decisions of federal courts of appeals granting judgment n.o.v. for Merrell Dow based upon the absence of epidemiological evidence showing a causal relationship between Bendectin use and birth defects") (citations omitted). Likewise, in *Renaud,* the trial court recognized that epidemiology is required in toxic tort cases "where collection of such evidence is possible." 749 F.Supp. 1545, 1554 (D.Colo.

1990) ("even if plaintiffs had been able to prove exposure by their direct evidence, they would have been required to submit epidemiological evidence in support of their causation contentions"), *aff'd,* 972 F.2d 304, 307 (10th Cir.1992) (noting that plaintiffs' causation evidence "was not sufficiently reliable, being drawn from tests on non-human subjects without confirmatory epidemiological data") (citations omitted).

C. More–Probable–Than–Not Burden Means Plaintiffs Must Establish a Doubling of Risk

Upon remand of *Daubert,* the Ninth Circuit focused on the crucial issue referenced by the Tenth Circuit in *Wilson,* 893 F.2d at 1154–55, and *Renaud,* 749 F.Supp. at 1554–55: whether expert witness opinion evidence is admissible when the available epidemiology does not demonstrate that the plaintiff's alleged injury was "more likely than not" caused by the defendant. 43 F.3d 1311, 1320–22 (9th Cir.1995), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). The Ninth Circuit defined the plaintiff's burden as follows:

> [Plaintiffs] must establish not just that their mothers' ingestion of Bendectin increased somewhat the likelihood of birth defects, but that it more than doubled it— only then can it be said that Bendectin is *more likely than not* the source of their injury.

In short, *Daubert,* 43 F.3d at 1320–22, *Wilson,* 893 F.2d at 1154–55, and *Renaud,* 749 F.Supp. at 1554–55, instruct that if the available body of epidemiology demonstrates that breast implants do not double the risk of any known disease, then plaintiffs' causation evidence is inadmissible.

There exists in the context of breast implanted women a "background rate" of injury; that is, the injuries of which the breast implant plaintiffs complain are not unique, but occur frequently in women without breast implants. *Hall,* 947 F.Supp. at 1402; *In re Breast Implant Cases,* 942 F.Supp. 958, 960–61 (E.&S.D.N.Y.1996). Because the injuries of which Plaintiffs complain occur commonly in women without breast implants, Plaintiffs must present ex-

pert testimony demonstrating that exposure to breast implants more than doubled the risk of their alleged injuries. *Hall,* 947 F.Supp. at 1403 (citing *Daubert,* 43 F.3d at 1320); *Sanderson v. International Flavors and Fragrances, Inc.,* 950 F.Supp. 981, 1004 (C.D.Cal.1996) (excluding causation evidence as irrelevant under *Daubert* where experts did not opine that exposure "more than doubled" the risk of injury) (citing *Daubert,* 43 F.3d at 1320–22). If exposure to breast implants does not at least double the risk of injury, then more than half of the population suffering from the injuries allegedly caused by breast implants would be injured anyway (the background rate of injury), thereby disproving legal causation. *Hall,* 947 F.Supp. at 1398; *see also Daubert,* 43 F.3d at 1321 ("[a] relative risk of less than two may suggest teratogenicity, but it actually tends to disprove legal causation, as it shows that Bendectin does not double the likelihood of birth defects").

 Under Colorado law, testimony about medical causation is only relevant if it allows a jury to find that it is more likely than not that the conduct of the defendant was a substantial factor in the plaintiffs' injury; in other words, causation must be proven within reasonable probability. *Kaiser Foundation Health Plan of Colo. v. Sharp,* 741 P.2d 714, 719 (Colo.1987) (jury may decide causation "as long as the evidence establishes such facts and circumstances as would indicate with reasonable probability that causation exists"). This means that Plaintiffs must present expert testimony demonstrating that exposure to breast implants more than doubled the risk of their alleged injuries. *Sharp v. Kaiser Foundation Health Plan of Colo.,* 710 P.2d 1153, 1155 (Colo.App. 1985) (plaintiff met standard of proof that defendant "substantially increased plaintiff's risk" since plaintiff's "chances of a heart attack, under this evidence, was more than doubled"), *aff'd,* 741 P.2d 714 (Colo.1987). In Colorado, a plaintiff seeking to prove causation must demonstrate that her injuries were "more likely than not" caused by exposure to defendant's product. *Kaiser,* 710 P.2d at 1155. In applying the *Daubert* criteria, "[t]his burden requires Plaintiffs to demonstrate that exposure to breast implants more than doubled the risk of their alleged inju-

ries." *Hall,* 947 F.Supp. at 1403 (citing *Daubert,* 43 F.3d at 1320). In terms of epidemiology, this means that the relative risk must be statistically significant.

The difference between groups is often expressed as the ratio between the incidence of the disease in the exposed group and the incidence in the unexposed group. Marcia Angell, M.D., SCIENCE ON TRIAL (1996) at 164. The relative risk simply indicates how high above the background level the risk is.

> The threshold for concluding that an agent was more likely the cause of a disease than not is a relative risk greater than 2.0. Recall that a relative risk of 1.0 means that the agent has no effect on the incidence of disease. When the relative risk reaches 2.0, the agent is responsible for an equal number of cases of disease as all other background causes. Thus, a relative risk of 2.0 implies a 50% likelihood that an exposed individual's disease was caused by the agent.

*Hall,* 947 F.Supp. at 1403 (quoting REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 168).

For example, if the relative risk for a disease between women with breast implants and women without breast implants is 1.2, it means that for every 10 women without implants who develop the disease, 12 women with implants in an equal population would develop the disease. SCIENCE ON TRIAL at 196.

> It is important to realize that we do not know exactly what a relative risk of 1.2 means for each of those 12 women who develop connective tissue disease. It could mean that in 2 of them, the implants were the sole cause of their disease and in the other 10 they played no role. Or it could mean that implants played a major role in 3 or 4 women and a very small one in the others. Or it could mean that implants contributed a varying amount to the disease in all 12.... All we could say for sure with a relative risk of 1.2 is that on *average,* implants contributed about 17 percent (0.2/1 .2) to the disease. For any one woman among the 12, then, we could not say that but for the implants, she would

not have developed the disease. Further, we would have to say that some other factor or group of factors was the dominant cause.

SCIENCE ON TRIAL at 196–97 (emphasis in original).

### D. The Epidemiological Evidence Demonstrates the Absence of a Doubling of the Risk

At least seventeen epidemiological studies of breast implants have been published in peer reviewed medical journals. (Ory Affidavit ¶¶ 35, 36). Every controlled epidemiological study concludes that silicone breast implants do not double the risk of any known disease. *See* Affidavits of Dr. Ory, M.D., Dr. Schlesselman, M.D., Dr. Felson, M.D., Dr. Layde, M.D., Dr. Marcus, M .D., Dr. Rose, M.D., Ph.D., Dr. Jones, M.D., and Dr. Steen, M.D., Exhibits A through H to Defendants' Science Brief. None of these studies support a conclusion that breast implants cause rheumatic or connective tissue diseases, either classic or atypical, in breast implanted women. *Id.* None of these studies reports a statistically significant elevation of risk of rheumatic or connective tissue disease, either classic or atypical, over 2.0. *Id.* The reported results from every published controlled epidemiological study uniformly show the absence of a doubling of the risk of any known disease among breast implant recipients. *Hall,* 947 F.Supp. at 1405 ("none of the 16 epidemiological studies found that women with silicone breast implants faced a relative risk of classical disease or disease signs and symptoms of anywhere near 2.0"). As a whole, these studies provide a solid body of epidemiologic evidence establishing that breast implants do not cause connective tissue disease, autoimmune disease or various symptoms.

Specifically, in June 1994, the New England Journal of Medicine published a large, rigorous, and well controlled epidemiological study conducted by the Mayo Clinic, which explored the hypothesized link between implants and connective-tissue and other diseases. Gabriel, et al., "Risk of Connective-tissue Diseases and Other Disorders After Breast Implantation," 330 *N. ENGL. J. MED.* 1697 (1994) ("the Mayo Clinic Study"). The Mayo Clinic Study failed to, find an association between implant history and various connective-tissue diseases and symptoms thereof, such as those alleged by plaintiffs. Rather, the Mayo Clinic Study found that women with implants had no greater incidence of connective tissue or autoimmune disorders than women without implants.

The largest study to date concluded that there is no doubling of the risk of connective tissue disease among women with breast implants. Hennekens, et al., "Self–Reported Breast Implants and Connective–Tissue Diseases in Female Health Professionals," 275 *J. AM. MED. ASSOC.* 616 (February 28, 1996) ("Hennekens Study"). The Hennekens Study included almost 400,000 female health professionals who completed mailed questionnaires, including more than 10,000 who reported having breast implants and almost 12,000 who reported having connective-tissue diseases between 1962 and 1991. *Id.* The relative risk for all connective-tissue diseases was estimated at 1.24 (95% confidence interval, 1.08 to 1.41). *Id.* As the authors themselves noted, this study suffered from bias which probably explains the slight increased relative risk. *Id.* Furthermore, the *Kelley* court summarized some of the limitations of this study: "[f]or the Hennekens study, the strength of association is low, the consistency of the association is also low (i.e., the study suggested that more tests were necessary before meaningful conclusions could be draw), alternative explanations are likely, the association is not specific, and there is no dose-response relationship." 957 F.Supp. at 879 (citing the Hennekens Study). As the court explained in *Hall,* the Hennekens Study, in which the relative risk was "only 1.24, ... cannot support expert testimony that silicone 'more likely than not' causes disease or signs and symptoms of disease in women." 947 F.Supp. at 1405.

A definition for a new atypical syndrome associated with silicone gel breast implants has not been set forth in the published medical literature, nor has it been defined by Plaintiffs' designated experts. A disease entity lacking definition cannot very well be examined in a controlled epidemiologic study. To the extent that there are case or anecdotal reports noting various symptoms or signs

in breast implanted women, without controls, these suggest only a potential, untested hypothesis that breast implants may be their cause.

> Such case reports are not reliable scientific evidence of causation, because they simply describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group ... [T]hey do not isolate and exclude potentially alternative causes ... and do not investigate or explain the mechanism of causation.

*Casey v. Ohio Medical Products,* 877 F.Supp. 1380, 1385 (N.D.Cal.1995). An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.

In the absence of a defined new atypical syndrome associated with silicone gel breast implants, a number of controlled epidemiologic studies have nonetheless examined the question of whether an atypical syndrome is associated with silicone gel breast implants. In a recent study conducted at the Harvard Medical School, involving 87,501 nurses, 1183 of whom had implants, the authors noted that "[w]e studied women with possible early milder or atypical forms of connective-tissue disease or with any sign or symptom of a connective-tissue disease who did not meet standard classification criteria." Sanchez–Guerrero et al., "Silicone Breast Implants and the Risk of Connective–Tissue Diseases and Symptoms," 332 *N. ENGL. J. MED.* 1666, 1668 (1995) ("the Harvard Nurses Study"). In conclusion, the Harvard Nurses Study authors found no statistically significant association between breast implants and atypical presentation of connective tissue disease or classic connective tissue disease.

Also notable is the consistency of the epidemiological studies. All of the significant epidemiological studies have failed to find a doubling of the relative risk. Consistency of findings is used not only by epidemiologists but all scientists as an important factor in assessing cause and effect. The consistent absence of an elevated relative risk weighs against any materially increased risk of disease caused by silicone gel breast implants.

**E. Plaintiffs' Causation Evidence Is Not Scientifically Reliable**

 To prove causation, Plaintiffs Zelinger and Roberts offer the testimony of rheumatologist Dr. Kassan, neurologist Dr. Klapper, neuropsychiatrist Dr. Hoffman, and biomaterials scientists, Dr. Guidoin and Dr. Blais.

No Plaintiffs' expert witness report states an opinion on general causation; the physician witnesses offer only specific causation opinions and the non-physician witnesses purportedly do not offer opinions about causation. The reports submitted by Plaintiffs' experts fail to present a single peer-reviewed, controlled epidemiologic study that support their causation theories. This is not to say that epidemiological studies are required in this type of tort action. Epidemiological studies are not the magical cure for legal disputes. In many instances, epidemiological data may be unavailable. A lack of epidemiology should not end the inquiry, but rather begin the inquiry into what other types of evidence a plaintiff can present to satisfy the burden of proof. There is a range of scientific methods for investigating questions of causation, for example, toxicology and animal studies, clinical research, and epidemiology, all of which have distinct advantages and disadvantages. The court's inquiry is whether reliable scientific evidence, based on sound methodology, has been presented. What is significant in this case is that the substantial body of epidemiological evidence demonstrates that silicone breast implants do not double the risk of any known disease.

Plaintiffs' expert witnesses Drs. Kassan and Klapper identified only three specific medical publications in support of their opinions. Dr. Kassan cites Hennekens, *supra,* and Silverman et al., "Reported Complications of Silicone Gel Breast Implants: An Epidemiologic Review," 124 *Annals of Internal Med.* 744 (April 15, 1996). Dr. Klapper cites Greenland et al., "A Case Control Study of Prosthetic Implants and Selected Chronic Diseases," *Annals of Epidemiology* 6:530–540 1996. None of the other Plaintiffs' experts specifically rely on any literature at all regarding causation.

As discussed above, the Hennekens study cited by Dr. Kassan demonstrated a modest increase in a relative risk of 1.24. It does not establish that breast implants more probably than not cause disease, and its findings are contrary to the other epidemiological studies which consistently demonstrate no increased relative risk. The Silverman article cited by Dr. Kassan is merely a review by the U.S. Food and Drug Administration ("FDA") of the epidemiologic literature, containing no original data. Although the article addresses the shortcomings of the epidemiology from a regulatory perspective (i.e. the epidemiology does not conclusively demonstrate safety), the relevant inquiry here is whether breast implants substantially increase (i.e.double) the risk of any known disease. Indeed, even the FDA acknowledges that "taken together, these studies suggest no substantial increase in the risk for scleroderma or other well-defined connective tissue diseases overall as a result of breast implantation." *Id.* at 751.

The Greenland article cited by Dr. Klapper does not involve breast implants. In fact, the authors note with regard to breast implants that: "[c]laims of such [systemic effects] have resulted in successful litigation against implant manufacturers, despite the fact that epidemiologic studies to date have not detected an association between implants and long-term health effects." *Annals of Epidemiology* 6:530. The authors also stated as to their data on bone, joint, testicular and penile implants: "[g]iven the limitations of our data, we cannot reach any firm conclusions regarding implant effects." *Id.* at 539.

Plaintiffs cite Hennekens, Silverman and Greenland, but point to no peer-reviewed epidemiological studies that support their causation theories. Their theories cannot, therefore, suffice as evidence because, as the Fifth Circuit stated in *Brock*, theories of toxic causation "unconfirmed by epidemiologic proof cannot form the basis for causation in a court of law." 874 F.2d at 315. Based on the conclusions reached in Hennekens, Silverman and Greenland, the court finds it unreasonable for Plaintiffs' experts to rely on these three studies to conclude that a causal relationship existed between silicone gel breast implants and the diseases and symptoms from which Plaintiffs allegedly suffer.

*Kelley,* 957 F.Supp. at 878; *Hall,* 947 F.Supp. at 1403–1407; *In re Breast Implant Cases,* 942 F.Supp. at 961.

### 1. Differential Diagnosis

■ Plaintiffs seek to introduce expert testimony from clinicians (i.e., treating physicians) who claim to be able to diagnose a patient with a disease caused by breast implants through the process of differential diagnosis. Drs. Klapper and Kassan have provided written opinions which state that they, as treating physicians of the Plaintiffs, have used the medical procedure of differential diagnosis and have determined to "a reasonable degree of medical certainty" that the illnesses and symptoms from which the Plaintiffs suffer are caused by the silicone from their silicone gel breast implants.

Such testimony is not scientifically reliable in the cases before the court because it confuses two distinct burdens. Plaintiffs must demonstrate two types of causation: general causation and specific causation. *Raynor,* 104 F.3d at 1376; *Kelley,* 957 F.Supp. at 875 (citations omitted); *Hall,* 947 F.Supp. at 1412–1413 (citations omitted); *Rutigliano,* 929 F.Supp. at 783; *In re Silicone Gel Breast Implants Products Liability Litig.,* 887 F.Supp. at 1477. By using differential diagnosis, a clinician can identify possible diseases the patient may have and, through a process of elimination, rule out diseases until a disease or symptom is left as the diagnosis. Differential diagnosis is not a scientific method by which a physician can determine whether silicone breast implants can cause disease in humans. As the court explained in *Hall,*

[d]ifferential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the 'most likely' cause of a set of signs and symptoms from a list of possible causes. However, differential diagnosis does not by itself *prove* the cause, even for the particular patient. Nor can the; technique speak to the issue of general causation. Indeed, differential diagnosis *assumes* that general causation has been proven for the list of possible causes it eliminates:

The process of differential diagnosis is undoubtedly important to the question of "specific causation." If other possible causes of an injury cannot be ruled out, or at least the probability of their contribution to causation minimized, then the "more likely than not" threshold for proving causation may not be met. *But, it is also important to recognize that a fundamental assumption underlying this method is that the final, suspected "cause" remaining after this process of elimination must actually be capable of causing the injury.* That is, the expert must "rule in" the suspected cause as well as "rule out" other possible causes. And, of course, expert opinion on this issue of "general causation" must be derived from a scientifically valid methodology.

947 F.Supp. at 1413 (emphasis in original) (quoting *Cavallo v. Star Enterprise,* 892 F.Supp. 756, 771 (E.D.Va.1995), *aff'd on this ground, rev'd on other grounds,* 100 F.3d 1150 (4th Cir.1996), *cert. denied,* 118 S.Ct. 684, 118 S.Ct. 684, 139 L.Ed.2d 631 (1998)). As a practical matter, the cause of many diseases remains unknown; therefore, a clinician who suspects that a substance causes a disease in some patients very well might conclude that the substance caused the disease in the plaintiff simply because the clinician has no other explanation. *See* Margaret A. Berger, "Evidentiary Framework," REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 81 (1994).

The kind of causation testimony offered by Plaintiffs' experts was summarized and rejected by Judge Prado in *Kelley:*

[T]he witness admits that if the Plaintiff did not have breast implants but had the exact same symptoms and blood chemistry, then his diagnosis would have been non-implant-caused Sjogren's Syndrome. Essentially, this is a bit like saying that if a person has a scratchy throat, runny nose, and a nasty cough, that person has a cold; if, on the other-hand, that person has a scratchy throat, runny nose, nasty cough, and wears a watch, they have a watch-induced cold. Such reasoning is extremely suspect, which has prompted other courts to reject it as unscientific in the absence of convincing epidemiology evidence.

957 F.Supp. at 882 (citing *Brock,* 874 F.2d at 310 n. 11). The causation testimony offered by the Plaintiffs is precisely the kind of subjective testimony that is inadmissible pursuant to Rules 702 and 703. "Reasoning that a cause-and-effect relationship exists simply because a large number of individuals with a particular characteristic develop a particular disease is fallacious, because it totally fails to account for the fact that both characteristics and diseases are widely distributed among the general population." (Ory Affidavit ¶ 50). In short, "a single differential diagnosis is a scientifically invalid methodology" for the purpose of demonstrating general causation. *Hall,* 947 F.Supp. at 1414. Differential diagnosis may be utilized by a clinician to determine what recognized disease or symptom the patient has, but it is incapable of determining whether exposure to a substance caused disease in the legal sense.

2. Plaintiffs' Experts' Clinical Experience Insufficient for General Causation Opinion

Plaintiffs' experts rely on their individual clinical experience of seeing many patients with silicone breast implants and their review of the medical literature to opine that silicone breast implants cause disease. Such experience is the equivalent or a series of case reports, or observations made about a particular patient. Case reports can give rise to a question about causation; epidemiology answers the question:

[T]he generally accepted view in the scientific community is that her methodology [case reports and animal studies] can be used to generate hypotheses about causation, but not causation conclusions. [S]cientifically valid cause and effect determinations depend on controlled clinical trials and epidemiological studies . . .

*Haggerty v. Upjohn Co.,* 950 F.Supp. 1160, 1164 (S.D.Fla.1996) (excluding causation evidence as scientifically unreliable and irrelevant pursuant to *Daubert* ).

As explained in *Hall,* "case reports. and case studies universally are regarded as an insufficient scientific basis for a conclusion regarding causation because case reports lack controls." 947 F.Supp. at 1411 (citations

omitted). Courts have rejected case reports as unreliable:

> Such case reports are not reliable scientific evidence of causation, because they simply described reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation. Even if some credibility were given to the study, it does not have the degree of clarity required for a validation of its results or its methodology which is sufficient for objective and independent peer review.

*Casey,* 877 F.Supp. at 1385; *Jones,* 933 F.Supp. at 898 ("[p]laintiffs' evidence falls far short of the proven cause and effect relationship that is necessary to satisfy the *Daubert* standard"); *Muzzey v. Kerr–McGee Chemical Corp.,* 921 F.Supp. 511, 519 (N.D.Ill.1996) ("[a]necdotal reports ... are not reliable bases to form a scientific opinion about a causal link") (citing REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 344 n. 25 (1994)).

### 3. Plaintiffs' Studies and Articles

■ Plaintiffs' have submitted 40 epidemiology studies, 40 immunology studies, 40 rheumatology studies, 40 toxicology studies, and 100 "general articles" regarding various scientific studies. The Plaintiffs' submissions are essentially identical to those submitted to the 706 panel convened by Judge Pointer in the multi-district litigation in the District of Alabama. None of the Plaintiffs' expert witness reports referred to any of these additional studies or articles; therefore, those materials cannot properly be considered as additional support for the witnesses' methodology or conclusions. Nevertheless, the court has examined the numerous studies and articles and determines that they do not reasonably support the conclusions of the Plaintiffs' expert witnesses.

Many of the studies and articles submitted by Plaintiffs were inconclusive, merely recommending that further studies be done. Some studies were, at best, remotely related to breast implants; for example, studies of occupational exposure to inhaled crystalline silica, such as asbestos, silica dust, quartz dust, and granite dust, and studies of the use of silicone oil in vitreoretinal surgery. *See* Jones Affidavit, Exhibit G to Defendants' Science Brief. A sampling of the studies and articles suffices to illustrate that these materials as a whole do not support the Plaintiffs' experts' conclusions regarding causation: Bar–Meir, E., et al., "Multiple Autoantibodies in Patients with Silicone Breast Implants," *Journal of Autoimmunity,* 8:267–77 (1/1/95) ("[t]he question why some women develop autoantibodies following exposure to silicone, or even overt autoimmune disease, is unresolved"); Claman, Henry, M.D. and Robertson, Alastair D., Ph. D., "Antinuclear Antibodies and Breast Implants," *Western Journal of Medicine,* 160(3): 225–28 (3/1/94) ("larger and more carefully executed analytical studies are needed to test ·the hypothesis that a relationship exists between breast implants and autoimmunity"); Giltay, Erik J., et al., "Silicone Breast Prostheses and Rheumatic Symptoms: a Retrospective Follow Up Study," *Annals of Rheumatic Disease,* 53:194–96 (1/1/94) ("we conclude that common and clinically manifest rheumatic diseases do not occur more frequently among women with silicone breast prostheses"); Granchi, Donatella, et al., "Silicone Breast Implants: The Role of Immune System on Capsular Contracture Formation," *Journal of Biomedical Materials Research,* 29(2):197–202 (2/1/95) ("our data suggest the hypothesis of an involvement of the immune system in the formation of an excess of fibrous tissue responsible for a severe capsule contracture ..."); Kossovsky, Nir, et al., "Surface Dependent Antigens Identified by High Binding Avidity of Serum Antibodies in a Subpopulation of Patients with Breast Prostheses," *Journal of Applied Biomaterials,* 4:281–188 (12/1/93) ("[t]he long-term biological and clinical consequences of the presence of these antibodies remains to be assessed"); Naim, J.O., et al., "The Induction of Type II Collagen Arthritis in the DA Rat Using Silicone Gel as Adjuvant," *Current Topics in Microbiology and Immunology—Immunology of Silicones,* 210:103–11 (1/1/96) ("silicone gel alone does not appear to be arthritogenic."); Wells, Karen E., M.D., et al., "The Health Status of Women

Following Cosmetic Surgery," *Plastic and Reconstructive Surgery,* 93(5):907–12 (4/1/94) ("no cases of scleroderma or lupus were found, and the incidence of arthritis was not significantly different between the implant and control groups"); Young, V. Leroy, M.D., et al., "HLA Typing in Women with Breast Implants," *Plastic and Reconstructive Surgery,* 96(7): 1197–1519 (12/1/95) ("[s]erologic testing, rheumatologic evaluations, and epidemiologic studies have failed to demonstrate an etiologic connection between silicone gel breast implants and any recognized connective-tissue disease in women who have undergone breast reconstruction or augmentation mammaplasty ... Thus far all the research into the question of what is happening with symptomatic breast implant patients has produced no conclusive proof that these women are experiencing any kind of immunologic response to their implanted devices"); McDonald, A.H., et al., "Silicone Gel Enhances Autoimmunity in NZB Mice but Fails to Induce Disease in BALB/C Mice," *Journal of Allergy and Clinical Immunology* 99(1): S195 (Abstract 785) ("[t]hus, our results are consistent with several epidemiological studies demonstrating no increase in the incidence of autoimmune disease in women with breast implants").

### 4. Temporality

 Plaintiffs' experts assert that causation may be inferred based upon the temporal sequence of implantation and the onset of illness. A temporal relationship by itself, provides no evidence of causation. *In re Swine Flu Immunization Products Liability Litig.,* 533 F.Supp. 567 (D.Colo.1980); *Willert v. Ortho Pharmaceutical Corp.,* 995 F.Supp. 979 (D.Minn. 1998) (citing *Sorensen v. Shaklee Corp.,* 31 F.3d 638, 649 (8th Cir. 1994)). Temporality at best addresses the issue of specific causation; therefore, evidence of temporality is inadmissible where no admissible evidence of general causation exists. *Kelley,* 957 F.Supp. at 882 ("[i]n the absence of any evidence regarding general causation, the Court will not permit Dr. Espinoza to testify as to specific causation") (citations omitted); *Hall,* 947 F.Supp. at 1413 ("[t]estimony regarding specific causation in

a given patient is irrelevant unless general causation is established") (citations omitted).

Even as to specific causation, temporality cannot withstand *Daubert* scrutiny. *See Cuevas v. DuPont,* 956 F.Supp. 1306, 1307–09 (S.D.Miss.1997) (excluding causation evidence based on the temporal relationship between exposure and medical problems); *Sanderson,* 950 F.Supp. at 988, 995–96, 1004 (excluding causation evidence consisting primarily of temporal relationship between exposure and onset of symptoms); *Cartwright v. Home Depot USA, Inc.,* 936 F.Supp. 900 (N.D.Fla. 1996) (excluding expert testimony where causation opinion of expert witness was based solely on temporal relationship); *Cavallo v. Star Enterprise,* 892 F.Supp. at 773 (a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Rule 702) (citing *Schmaltz v. Norfolk & Western Ry. Co.,* 878 F.Supp. 1119, 1122 (N.D.Ill.1995)); *In re Swine Flu Immunization Products Liability Lit.,* 533 F.Supp. at 572 (mere temporal relation is insufficient to establish legal causation).

### F. Stuart Kassan, M.D.

 Plaintiffs' rheumatology expert, Stuart Kassan, M.D., is board-certified by the American College of Rheumatology (ACR). If permitted, Dr. Kassan would testify that as to Plaintiffs Zelinger and Roberts:

it is my medical opinion to a reasonable degree of medical certainty that the silicone gel breast implants to which this patient was exposed caused many of her above described symptoms and illnesses.

(Kassan's reports, Exhibit 5 to Plaintiffs' July 15, 1997 Opposition to Defendants' Science Brief). Dr. Kassan limits his opinion to specific causation—he will not testify that silicone breast implants cause disease in people in general. (Kassan Deposition, April 15, 1998 pp. 78–79). The Plaintiffs' symptoms and "problems" vary widely, and include Sjogren's syndrome, peripheral neuropathy, Raynaud's phenomenon, CREST syndrome, and fibromyalgia. As a basis for his opinion Dr. Kassan states as to each Plaintiff that

"this patient has been exposed to silicone from her breast implants which *may* have stimulated the immune system causing the disease process." He opines that "there is a basis in the literature to *suggest* that silicone is related to autoimmune disease," citing *JAMA,* February 28, 1996 Vol. 275, No. 8 ("Hennekens study"); *Annals of Internal Medicine,* April 15, 1996, Vol. 124, No. 8 ("Silverman study"); and unidentified abstracts and publications from *Arthritis and Rheumatism,* 1994, 1995, and 1996.[4] However, Dr. Kassan recently stated that he is not relying on any published medical literature. (Kassan Deposition pp. 130–31).

First, a suggestion or possibility of a relationship is insufficient for a causation opinion under Colorado law, the Federal Rules of Evidence, and *Daubert,* 509 U.S. at 579, 113 S.Ct. 2786. *Songer v. Bowman,* 804 P.2d 261, 265 (Colo.App.1990), *aff'd* 820 P.2d 1110 (Colo.1991); *Kaiser v. Sharp,* 741 P.2d at 719. The cited articles do not state or otherwise support the conclusion that silicone breast implants can cause systemic disease, and are not a reliable basis for the conclusion reached by Dr. Kassan.

Second, the specific causation evidence offered by Dr. Kassan is non-epidemiological in nature. In the face of numerous epidemiological studies, Dr. Kassan relies on his clinical experience, differential diagnosis, and his review of the medical literature to conclude that the Plaintiffs' described symptoms and problems are caused by their exposure to silicone gel breast implants. Plaintiffs have provided no validation of Dr. Kassan's methodology as being generally accepted in the medical community or reasonably relied upon by other rheumatologists in reaching an opinion on causation. The rheumatology community looks to controlled studies (epidemiology) and the Bradford Hill criteria to determine cause of diseases.[5] Reliance on clinical experience, case reports and other anecdotal evidence has been rejected by the American College of Rheumatology as a basis for opinions on causation. *See* American College of Rheumatology, "Statement on Silicone Breast Implants," October 1995 ("[t]he American College of Rheumatology believes that these studies provide compelling evidence that silicone implants expose patients to no demonstrable additional risk for connective tissue or rheumatic disease. Anecdotal evidence should no longer be used to support this relationship in the courts ..."), and "Updated Silicone Breast Implants Statement" (10/22/95) ("[t]o date, there continues to be no clear and consistent association of a defined connective tissue disease with silicone breast implants"); European Committee on Quality Assurance and Medical Devices in Plastic Surgery, "Consensus Declaration EQUAM", June 28, 1996 ("[t]here is conclusive scientific—clinical, immunological, epidemiological—proof, that silicone breast implants do not cause identified and recognised [sic] auto-immune diseases nor connective tissue diseases such as rheumatoid arthritis, scleroderma, systemic lupus erythematosus. There is no consistent evidence, that implants are responsible for undefined connective tissue diseases"); National Multiple Sclerosis Society, "Silicone Breast Implants and Multiple Sclerosis–Like Disorder," May 13, 1994 ("[i]t is important to note that there are no valid scientific data indicating that silicone implants are related to the onset of typical multiple sclerosis"); and the epidemiology discussed at part II.C. of this memorandum opinion and order, *su-*

4. Reference to unspecified abstracts and articles does not comply with Fed.R.Civ.P. 26 and MDL Order No. 30 with respect to revealing the basis for an expert's opinions. The witness will not be permitted to express opinions based upon literature which was not specifically identified in his report.

5. Even if the epidemiology demonstrated that breast implants doubled the risk of disease, a set of additional criteria known as the Bradford–Hill criteria must be satisfied. Once an association has been shown, the Bradford–Hill criteria are applied to determine whether there is actually a cause and effect. (Ory Affidavit ¶ 30, Schlessel-

man Affidavit ¶ 27, Exhibits A and B to Defendants' Science Brief). The Bradford–Hill criteria start with an association demonstrated by epidemiology and then apply such criteria as the temporal sequence of events, the strength of the association, the consistency of the observed association, the dose-response relationship, and the biologic plausibility of the observed association. Even if the epidemiology demonstrated that breast implants double the risk of disease (which the epidemiology does not demonstrate), Plaintiffs' causation experts must still satisfy the additional Bradford–Hill criteria to establish scientific cause and effect. Plaintiffs experts have not addressed the Bradford–Hill criteria at all.

*pra.* Dr. Kassan acknowledges that "[t]here have been no definitive studies on the relationship between atypical disease, such as the one which this patient suffers from, and silicone." (Kassan's reports). Dr. Kassan's failure to utilize the epidemiology in forming his opinion has not been explained.

Plaintiffs claim that Dr. Kassan relied on differential diagnosis to rule out causes other than silicone for plaintiffs' complaints and symptoms. However, Dr. Kassan does not explain what alternative causes he considered, or how he ruled out other possible causes. Dr. Kassan admits that "many of my patients with symptoms such as these do not have breast implants." As discussed in part II.D.1. of this memorandum opinion and order, *supra.*, differential diagnosis is not a means to determine whether an exposure to a chemical can cause disease. Dr. Kassan offers no tested or testable theory to explain how, from his limited information, he was able to eliminate all other potential causes of Plaintiffs Zelinger's and Roberts' conditions, nor does he explain how he alone can state as a fact that the Plaintiffs' breast implants caused their "problems."

▮ A statement does not become scientific knowledge because it is uttered by a doctor. Nor can an expert witness' self-serving assertion that his conclusions were derived by a scientific method be deemed conclusive. *Joiner,* 118 S.Ct. at 518–19 ("[b]ut nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only the *ipse dixit* of the expert"); *Daubert,* 43 F.3d at 1316 (to demonstrate the reliability of proffered scientific evidence, "an expert's bald assurance of validity is not enough"); *Viterbo,* 826 F.2d at 424 (when the expert brings "to court little more than his credentials and a subjective opinion," this is not evidence that would support a judgment and it offers no expert assistance to the jury); *Grimes v. Hoffmann–LaRoche, Inc.,* 907 F.Supp. 33, 38 (D.N.H. 1995) ("an expert cannot establish that a fact is generally accepted merely by saying so"). Dr. Kassan's conclusory statement that he has ruled out other causes for the Plaintiffs' symptoms is not supported by any meaningful information about how he was able to exclude the many possible alternative causes

of the problems alleged by the Plaintiffs. *Stover v. Eagle Products, Inc.,* 1996 WL 172972 *11 (D.Kan.1996) ("[a]n explanation for discounting those alternative causes is critical to evaluating the methodology used in reaching his conclusion. Yet, based on the information apparently relied on ... and the conclusory nature of his opinion, it is impossible to discern any manner by which the alternative causes were excluded.")

Dr. Kassan relies on his observations of the women he has treated in his clinical practice. These observations are in the nature of case reports or case studies. (Ory Affidavit ¶ 53). Dr. Kassan has not developed appropriate control groups (women without breast implants) with which to compare the women in his practice. *Id.* Dr. Kassan acknowledges that many of his patients with similar symptoms do not have breast implants. He admits that he has not identified a difference between his patients with Sjogren's syndrome or lupus-like phenomena and breast implants and his patients with Sjogren's syndrome or lupus-like phenomena who do not have breast implants. (Kassan Deposition pp. 61–62). The evidence indicates that many of Dr. Kassan's patients are litigants who have been referred to him. These facts contribute to a high rate of error for his hypothesis. The relatively small size of Dr. Kassan's sample of women with breast implants also indicates that it is not reasonably relied upon to form his conclusion that the Plaintiffs' breast implants caused their symptoms.

Dr. Kassan has performed no testing of his hypothesis that silicone breast implants caused atypical rheumatic disease in the Plaintiffs. ACTD is not defined and is at best an untested hypothesis. Without an accepted disease definition for ACTD, it cannot be tested scientifically, yet some epidemiological studies looked at atypical presentations and symptoms of rheumatic disease and found valid no association, *i.e.*, "the Harvard Nurses Study". Dr. Kassan has not published any of the theories he has proffered in any peer-reviewed journal. Dr. Kassan has not subjected his methodology of determining causation by clinical experience and differential diagnosis to peer-review.

Peer review and publication weigh heavily in determining the reliability of expert testimony because such review "increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. The epidemiology studies relied on by Defendants have been printed in peer-reviewed publications and subjected to close scrutiny by the scientific and/or medical community.

Dr. Kassan's non-epidemiological methodology, including reliance on anecdotal case reports and theories about the mechanism by which breast implants might cause disease, is not sufficient to support his conclusions that are directly contrary to the epidemiology. Dr. Kassan's non-epidemiological methodology has not been objectively tested, has no known rate of error, and is not generally accepted by the medical community as validation that silicone gel breast implants caused the Plaintiffs' various conditions and symptoms.

> When a scientist claims to rely on a method practiced by most scientists, yet presents conclusions that are shared by no other scientist, the district court should be wary that the method has not been faithfully applied. It is the proponent of the expert who has the burden of proving admissibility. To enforce this burden, the district court can exclude the opinion if the expert fails to identify and defend the reasons that his conclusions are anomalous.

*Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir.1996). The substantial body of epidemiology renders Dr. Kassan's non-epidemiological evidence scientifically unreliable. *See Ambrosini v. Labarraque*, 101 F.3d 129, 138–39 (D.C.Cir.1996), *cert. dismissed*, — U.S. —, 117 S.Ct. 1572, 137 L.Ed.2d 716 (1997).

In addition, no opinion about general causation was revealed in Dr. Kassan's report. In the absence of proof of general causation,

Dr. Kassan's specific causation testimony is irrelevant as it does not "fit" plaintiffs' case. *Kelley v. American Heyer–Schulte Corp.*, 957 F.Supp. 873, 880–84 (W.D.Tex.1997); *Hall*, 947 F.Supp. at 1413.

In sum, Plaintiffs have not met their burden to demonstrate that Dr. Kassan's methodology is reliable to determine general or specific causation of "auto-immune" or systemic disease by silicone gel breast implants. As such, his testimony about a causal connection between breast implants and systemic disease is inadmissible under Rule 702. *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 501–03 (9th Cir.1994); *Hall*, 947 F.Supp. at 1414. Because the data and methods upon which Dr. Kassan's testimony is based are not of the type reasonably relied upon by experts in the field of rheumatology in forming opinions about whether exposure to silicone can cause disease in humans or in an individual patient, Dr. Kassan's testimony is likewise inadmissible under Rule 703.[6]

### G. Jack Klapper, M.D.[7]

■ Plaintiff Roberts' neurology expert, Jack A. Klapper, M.D. is board-certified in neurology. If permitted, Dr. Klapper would testify that to a reasonable degree of medical certainty, Roberts' silicone gel breast implants caused the neurological disorders from which she suffers:

> it is my opinion, to a reasonable degree of medical certainty, that the silicone gel breast implants to which this patient was exposed caused the neurologic disorders from which she suffers.

(Klapper's report, Exhibit 6 to Plaintiffs' July 15, 1997 Opposition to Defendants' Science Brief). The reported basis for Dr. Klapper's opinion is his clinical experience in treating patients with silicone implants, including breast implants; "standard medical proce-

---

**6.** As stated by Plaintiffs' counsel on September 2, 1997, "Dr. Kassan has noted that there is a common element among the patients, and that is that many who exhibit similar symptoms have had the exposure to silicone. That doesn't mean that he has done a study. That does not mean that he wants to become an expert for the world, that he's going to publish. That doesn't mean that he has created some kind of an epidemiological study that should be subject to the Sir Brad-

ford Hill criteria." For these reasons also, the court concludes Dr. Kassan's testimony on causation of systemic disease is inadmissible under the Federal Rules of Evidence, as interpreted by *Daubert*, 509 U.S. at 579, 113 S.Ct. 2786.

**7.** The court has been notified that Dr. Klapper has been withdrawn as an expert witness in Plaintiff Zelinger's case.

dures"; ruling out other causes for symptoms; and a review of the relevant literature in the normal practice of medicine. *Id.*

Dr. Klapper's proffered testimony on causation is not scientifically reliable. Dr. Klapper recites that "there is a basis in the literature to *suggest* that silicone is related to 'neurologic disorders.'" He does not state that the literature supports a causal relationship. A suggestion of a relationship between silicone breast implants and neurologic disease (suggested only by Dr. Klapper) is insufficient for a reliable causation opinion under Colorado law, the Federal Rules of Evidence, and *Daubert*, 509 U.S. at 579, 113 S.Ct. 2786. *Songer*, 804 P.2d at 265; *Kaiser*, 741 P.2d at 719.

Dr. Klapper acknowledges that there are no definitive studies supportive of his opinion. No study supports any causal association between silicone breast implants and neurologic disorders. In fact, several studies indicate that there is no support for the hypothesis that silicone breast implants cause neurologic disease. Nyrén, O., M.D., et al., "Breast implants and risk of neurologic disease," *Neurology*, 50:956–961 (1998); Winther, J.F., M.D., et al., "Neurologic disease among women with breast implants," *Neurology*, 50:951–955 (1998). Dr. Klapper cites only one specific article, Greenland and Finkle, "A Case–Control Study of Prosthetic Implants and Selected Chronic Disease," *Annals of Epidemiology* 6, 530–540, 1996 ("Greenland study") as a basis for his opinion. This study did not involve silicone breast implants. Dr. Klapper's conclusion is different than that of the authors of the Greenland study, who did not conclude that silicone breast implants can cause neurologic disease. The method used by Dr. Klapper amounts to differential diagnosis, which is not a methodology used by the medical or scientific community to determine cause of disease. Nor is it reliable methodology for Dr. Klapper to reach a conclusion based on one study, which does not involve breast implants, where the authors did not reach the same conclusion as Dr. Klapper. *See Jones*, 933 F.Supp. at 898.

Plaintiffs have provided no validation of Dr. Klapper's methodology as generally accepted in the medical community or reasonably relied upon by other neurologists in reaching an opinion on causation. In Ferguson, "Silicone Breast Implants and Neurologic Disorders—Report of the Practice Committee of the American Academy of Neurology," *Neurology*, V. 48, 1504–1507, June 1997, the American Academy of Neurology states that "[n]o studies presently support any association with neurologic disorders." The Ferguson report sets forth the accepted methodology for determining the cause of disease: the Bradford Hill criteria, and states that "[n]one of these criteria can be satisfied to make a case for the occurrence of neurologic disease in women that is caused by silicone breast implants." The report describes case studies as "the poorest form of evidence for drawing causal inference." Without explanation, Dr. Klapper disregards the methodology of his speciality.

Dr. Klapper's hypotheses have not been tested or subject to publication and peer review. Because Dr. Klapper acknowledges that "many of my patients with peripheral neuropathy do not have breast implants" his reasoning and conclusions as to causation have a high rate of error. In the absence of proof of general causation, Dr. Klapper's testimony regarding his differential diagnosis is irrelevant because it does not "fit" Plaintiffs' cases.

While Dr. Klapper purports to have ruled out other causes of the Roberts' "disorders," he does not identify what alternative causes he considered, or how he went about ruling out other causes for her neurologic disorders. Relying on differential diagnosis methodology, Dr. Klapper ignores the epidemiologic studies and the medical literature that contradict his proffered opinion.

Plaintiff Roberts has not met her burden to demonstrate that Dr. Klapper's methodology is reliable to determine general or specific causation of neurological disorders by silicone gel breast implants. There has been no showing that the information upon which he relied is of the type normally relied upon by experts in his field in forming opinions about whether exposure to silicone can cause neurological disorders in humans or in an individual patient. Dr. Klapper's testimony about a causal connection between breast implants and neurological disorders is inad-

missible under Rules 702 and 703. *Claar,* 29 F.3d at 501–03; *Hall,* 947 F.Supp. at 1414.

### H. Daniel Hoffman, M.D.

■ Plaintiffs' neuropsychiatric expert, Dr. Daniel Hoffman, M.D., is board certified by the American Board of Psychiatry and Neurology and Academy of Certified Neurotherapists. Dr. Hoffman has proffered opinions that Plaintiffs Zelinger and Roberts suffer from neurocognitive and neuropsychological disorders. If permitted, Dr. Hoffman would testify regarding Zelinger:

> Based on this patient's complicated history, neuropsychological testing and Digital EEG, her most probable cause for her neurocognitive complaints would be Cognitive Disorder, NOS (294.90), secondary to the temporal relationship to Silicone Toxicity.

If permitted, Dr. Hoffman would opine regarding Roberts:

> This patient's history is suggestive of neuropsychiatric sequelae that have a temporal relationship to silicone breast implants. Her neuropsychological testing did not demonstrate significant abnormalities, however, the computer enhanced EEG did suggest an atypical organization of generators over the left hemisphere. Visual and auditory evoked potentials were normal. Her current DSM–III–R diagnosis would be Organic Mental Disorder, NOS (294.80), Ruling Out Chemically Induced Autoimmune Dysfunction as a causative factor.

(Hoffman's Exhibit 7 to Plaintiffs' July 15, 1997 Brief in Opposition to Defendants' Science Brief). Defendants challenge Dr. Hoffman's opinions as scientifically unreliable and irrelevant to Plaintiffs' claims.

First, Dr. Hoffman's conclusion as to Plaintiff Roberts amounts to no more than a suggestion or possibility of a causal relationship, which is insufficient for a causation opinion under Colorado law, the Federal Rules of Evidence, and *Daubert,* 509 U.S. at 579, 113 S.Ct. 2786. *Songer,* 804 P.2d at 265; *Kaiser,* 741 P.2d at 719.

Second, Dr. Hoffman does not provide any discernable objective scientific basis for his opinion. Dr. Hoffman cites no scientific literature or studies of any kind to support his opinions, he does not describe or define what "silicone toxicity" is, he refers to no studies examining the relationship between silicone exposure and neurocognitive deficits, he relies on no clinical experience, he relies on no animal studies, and he has no basis for his relating silicone as the cause of neurocognitive problems other than a temporal relationship. Dr. Hoffman neither cites nor relies on any scientific authority to support his methodology or conclusions.

Third, Dr. Hoffman's methodology and opinions are scientifically unreliable. Plaintiffs present no scientific support for Dr. Hoffman's methodology or opinions and no proof that they are reliable, or based upon data normally relied upon by experts in the field. In fact, Dr. Hoffman's methodology is not accepted in the field of neurology. "No studies presently support any association with neurologic disorders." Ferguson, "Silicone Breast Implants and Neurologic Disorders—Report of the Practice Committee of the American Academy of Neurology," *Neurology,* V. 48, 1504–1507, June 1997. "No controlled epidemiological studies conclude that silicone breast implants are associated with any form of neuropsychological deficit or cognitive dysfunction." (Ory Affidavit ¶¶ 55, 63; Nyrén, O., M.D., et al.; Winther, J.F., M.D., et al., *supra.*). Dr. Hoffman is not aware of any epidemiological studies looking at cognitive complaints for women with breast implants. (Hoffman Deposition, March 24, 1998 p. 56).

Defendants have submitted information from Dr. Elizabeth Kozora, Dr. Ronald Kramer, and Dr. Marc Nuwer that challenges Dr. Hoffman's methodology with respect to diagnosing Plaintiffs with cognitive dysfunction and with respect to causation. (Exhibits E, F, H, and I to Defendants' August 8, 1997 Reply Brief). Dr. Hoffman's opinion that silicone breast implants cause cognitive deficits is merely a hypothesis which is not generally accepted in the medical community, has not been scientifically tested, and has not been subjected to peer review. The factors set forth in *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786, "still require that the methodology and reasoning used by a witness have a significant place in the discourse of experts in the field." *Caval-*

*lo,* 100 F.3d at 1159. There is substantial evidence from which the court can conclude that Dr. Hoffman's methodology and conclusions are not generally accepted in the neurological community.

Fourth, Dr. Hoffman used quantitative electroencephalography ("QEEG") in diagnosing the Plaintiffs. QEEG is not well recognized in the clinical setting. In his April 22, 1993 deposition, Dr. Hoffman conceded that the scientific community does not agree with him about the value of QEEG as a clinical diagnostic tool. "QEEG techniques are very predisposed to false-positive errors." Nuwer, Marc, M/D., Ph.D., "Assessment of Digital EEG, Quantitative EEG, and EEG Brain Mapping: Report of the American Academy of Neurology and American Clinical Neurophysiology Society", *Neurology* 1997, 49:277–292 (Exhibit G to Defendants' August 8, 1997 Reply Brief). "In some circumstances, QEEG has some positive values, but they are outweighed by the substantial problems encountered in trying to use the tests clinically." *Id.* at 49:280. QEEG "is not recommended for use in civil or criminal judicial proceedings." *Id.* at 49:285. QEEG is an unreliable, unacceptable methodology for diagnosing cognitive disorders and is not generally accepted by the relevant scientific community for that purpose. *See* APA Official Actions, "Quantitative Electroencephalography: A Report on the Present State of Computerized EEG Techniques," *Am.J. of Psych.,* 148:7, July 1991, at 962; *see also Head v. Lithonia Corp. Inc.,* 881 F.2d 941, 942–44 (10th Cir.1989) (plaintiff, as proponent of this scientific evidence, did not meet her burden of showing that the proffered QEEG test has achieved some scientific acceptability and that the test has a reasonable measure of trustworthiness); *Brownell v. Bulldog Trucking Co., Inc.,* Civ. 4–91–0005 (E.D.Tenn. July 7, 1993); *Tran v. Hilburn,* 948 P.2d 52, 57 (Colo.App. 1997) ("QEEG is not generally accepted in the relevant scientific and clinical community for the purposes for which the evidence was offered."); *Ross v. Schrantz,* No. C8–94–1729, 1995 WL 254409 (Minn.Ct.App. June 14 1995) (record supported district court's decision to exclude QEEG evidence). Plaintiffs have presented no scientific validation of the use of QEEG.

Plaintiffs concede that QEEG is an experimental test, but argue that Dr. Hoffman did not use only QEEG in his assessment of them. Plaintiffs assert that Dr. Hoffman also used differential diagnosis to arrive at his opinions about causation. However, Dr. Hoffman does not explain what alternative causes he considered, or how he ruled out other possible causes. Dr. Hoffman offers no tested or testable theory to explain how, from his limited information, he was able to eliminate all other potential causes of Zelinger's and Roberts' conditions.

While Plaintiffs argue that Dr. Hoffman also used other methodology to reach his opinions, his conclusions regarding causation of Plaintiffs' "neurocognitive complaints" are entirely based on his interpretation of the QEEG. The QEEG results are integral to Dr. Hoffman's conclusions about Plaintiffs' neurocognitive disorders and their cause. Dr. Hoffman found Plaintiffs' performances on various neuropsychological tests were "average," "normal," at "a high level of functioning," "within normal limits," and "with no moderate to significant abnormalities." (Hoffman reports, Exhibit 7 to Plaintiffs' July 15, 1997 Opposition to Defendants' Science Brief). Relies solely on the QEEG results in opining that Plaintiffs have cognitive disorders.

Fifth, Dr. Hoffman's causation opinions are based on nothing more than a "temporal relationship," *i.e.,* that the implantation occurred before cognitive deficits were reported by Plaintiffs. Dr. Hoffman infers causation based upon nothing more than temporal sequence of implantation and the onset of illness. (Hoffman Deposition pp. 58–59). As discussed in part E. 4., above, a temporal relationship by itself, provides no evidence of causation. *In re Swine Flu Immunization Products Liability Litig.,* 533 F.Supp. at 567. Temporality at best addresses the issue of specific causation; therefore, evidence of temporality is inadmissible where no admissible evidence of general causation exists. *Kelley,* 957 F.Supp. at 882 (citations omitted); *Hall,* 947 F.Supp. at 1413 (citations omitted). The fact of a temporal relationship establishes nothing except a relationship in time. Proof of a temporal rela-

tionship merely suggests the possibility of a causal connection and does not assist Plaintiffs in proving medical causation. *In re Swine Flu Immunization Products Liability Lit.*, 533 F.Supp. at 581; *In re Agent Orange Product Liability Lit.*, 611 F.Supp. at 1249; *Stover*, 1996 WL 172972 at *12.

Even as to specific causation, temporality cannot withstand *Daubert* scrutiny. *See Cuevas*, 956 F.Supp. at 1307–09; *Sanderson*, 950 F.Supp. at 988, 995–96, 1004; *Cartwright*, 936 F.Supp. at 900; *Cavallo*, 892 F.Supp. at 773; *Schmaltz*, 878 F.Supp. at 1122; *In re Swine Flu Immunization Products Liability Lit.*, 533 F.Supp. at 572.

Dr. Hoffman's causation opinions fall short of being validated by "sound science." As Dr. Hoffman admits that there are many possible causes of the Plaintiffs' conditions, his conclusions are subject to a high rate of error. The facts and data upon which Dr. Hoffman's testimony is based are not of a type reasonably relied upon by experts in the field of neurology and neuropsychology. Dr. Hoffman's methods fail to provide data which yields reliable conclusions on the existence of any cognitive deficits or causation.

Finally, Dr. Hoffman's opinions do not "fit." No opinion about general causation was revealed in Dr. Hoffman's report. Because there is no reliable scientific evidence that silicone gel breast implants are a legitimate cause of neurologic disease or neurocognitive deficits, Dr. Hoffman's testimony regarding his diagnosis is irrelevant as it does not "fit" Plaintiffs' case.

Plaintiffs have not met their burden to demonstrate that Dr. Hoffman's methodology is reliable to determine general or specific causation of neurocognitive disorders by silicone gel breast implants. The methodology upon which he relied is not of the type normally relied upon by experts in his field in forming opinions about whether silicone breast implants can cause neurocognitive disorders in humans or in an individual patient. Dr. Hoffman's testimony about a causal connection between breast implants and neurocognitive disorders is inadmissible under Rules 702 and 703. *Claar*, 29 F.3d at 501–03; *Hall*, 947 F.Supp. at 1414.

### I. Robert Guidoin, Ph.D.

Plaintiffs first "biomaterials" expert, Robert Guidoin, Ph.D., is a chemist and "biological engineer." Plaintiffs' counsel represented at the September 3, 1997 hearing that Dr. Guidoin would testify about his visual observations of the Plaintiffs' removed implants and any scientific study that he performed on the implants themselves. Plaintiff's counsel represented that Dr. Guidoin will not opine regarding causation. Also based on Plaintiffs' counsel's representations, the court determined at the September 3, 1997 hearing that "Dr. Guidoin will not testify as to any defect in the implant." Hearing Transcript Vol. II p. 291.

Plaintiffs do offer testimony from Dr. Guidoin about the condition of the implants, the Plaintiffs' breast tissue, the presence and significance of granulomas, the presence and extent of inflammation, and the activity of cells around the capsule. Dr. Guidoin's reports concern his observations of the implants, identification of chemicals (including silicone) in breast tissue or on the implant, identification of certain types of cells in breast tissue, and the activity and condition of the cells in the breast tissue. Dr. Guidoin's reports describe his visual inspection of the implants and tissue samples. Dr. Guidoin recites his use of certain techniques such as scanning electron microscopy (SEM) and electron dispersive x-ray analysis (EDXA). His reports indicate his conclusions regarding inflammatory reactions in the Plaintiffs' tissues; the presence of inflammatory cells such as lymphocytes, plasmocytes, spumous macrophages, multinucleated giant cells, and granuloma; foreign-body granulotamous reactions to the presence of silicone; the presence of vacuoles containing silicone; the presence of silicone in the Plaintiffs' adipose tissue; fibrosis of adipose tissue; and the presence of calcified deposits and compact collagen fibers. The issues for the court to resolve are whether the observations and opinions proffered by Dr. Guidoin are within the scope of his expertise, are based upon appropriate methodology, and are based on facts or data of a type reasonably relied upon by experts in the particular field.

Defendants appear to concede that Dr. Guidoin is qualified and could express opinions about two areas: 1) the presence of silicone or other chemical material in the tissue samples observed, and 2) the chemical make up of the implant and any contaminants (as long as the identification of the material is based upon a reliable methodology such as EDXA or SEM and the opinions and their bases have been revealed in the expert reports submitted for each Plaintiff).

Plaintiffs present nothing more than Dr. Guidoin's *curriculum vitae* to establish his qualifications. His Ph.D.s are in chemistry and biological chemistry. (Exhibit E to Defendants' Motion in Limine to Exclude Expert Testimony of Robert Guidoin p. 4361; Exhibit 10 to Plaintiff's July 15, 1997 Brief in Opposition). Dr. Guidoin is not a medical doctor. Dr. Guidoin does not have an advanced degree in a medical field such as immunology, toxicology or pathology. He concedes he is "not licensed to give pathological diagnoses." (Exhibit D to Defendants' Motion in Limine re: Guidoin, p. 79). The observations in his reports about the tissue slides were made by a pathologist on his "team." (*Id.* at 80).

First, Plaintiffs present no definition of the field of "biomaterials" or the disciplines or specialized knowledge involved in such field. Dr. Guidoin's opinions involve subjects with respect to which there is no evidence of his qualifications. Dr. Guidoin's expertise in chemistry and "biological engineering" do not necessarily make him qualified to testify in the medical areas of pathology, inflammatory reactions, or cellular activity in humans. Dr. Guidoin's background and experience do not necessarily qualify him to testify about how the human body medically responds to breast implants. The court concludes that Dr. Guidoin is not qualified to give any opinion concerning disease causation, histology (including the presence of inflammation in tissue), the effects of silicone in the body, or the types of cells and function of cells observed in breast tissue.

Second, Plaintiffs have provided no explanation or validation of the methodology by which Dr. Guidoin reached any of his conclusions. He concludes without explanation that the presence of certain cells and types of tissue "is to be expected with the presence of silicone." Dr. Guidoin does not provide any scientific basis to support his methodology or his opinions identifying the physiological reaction to silicone in human tissue. Dr. Guidoin does not rely on any scientific literature on this issue. There has been no showing that Dr. Guidoin has a scientific basis for any opinion about the effect of silicone on body tissue, or cellular activity in the breast tissue. His opinions on those issues are therefore unreliable, and must be excluded under Rules 702 and 703.

Accordingly, Dr. Guidoin will be permitted to testify as an expert only as to his observations of the condition of Plaintiffs Zelinger's and Roberts' implants, the chemical composition of the implants, and the presence of silicone or other chemical material that he observed in Plaintiffs Zelinger's and Roberts' tissue samples.

### J. Pierre Blais, Ph.D.

Plaintiffs' second "biomaterials" expert, Pierre Blais, Ph.D., is an organic chemist. Dr. Blais was designated to testify as to "defects in the product design, manufacture, marketing and labeling of silicone gel breast implants, the history of the design, manufacture and regulation of silicone implants in general, the chemistry of silicone in an organic environment and the defects in [the individual plaintiffs'] implants in particular." (Plaintiffs' March 28, 1997 Designation of Experts and Treating Physicians Who Will Offer Testimony on Causation Issues). Dr. Blais will testify about his visual observations of the explanted prostheses, the condition of the tissue surrounding the implants, and the "degradation" of the implants. His reports reveal that he would offer opinions on, *inter alia*, the following issues:

1. His visual observations concerning the condition of the removed prostheses;

2. Condition of the capsular tissue surrounding the implant;

3. Long term health effects from silicone gel breast implants;

4. Quality control with respect to the formulation of silicone used in breast implants;

5. Corporate history and practices of breast implant manufacturers;

6. Injury or disease mechanisms from breast implants including:

(a) "surgical trauma and surgical·misadventures resulting in damage to functional/sensorial parts of the chest and the upper limbs;"

(b) "implants cause major structural, physiological and biochemical changes in the breast environment;"

(c) implants "act as 'time release systems' for pharmacologically active compounds;"

(d) biomechanical effects causing "compressive trauma, excoriation, distension, atrophy, and restrictive adhesion of tissues or compressive/occlusive ischemia of the vasculature" in the area of the breast;

(e) biochemical effects inducing "fibrotic, inflammatory or destructive tissue changes;"

(f) "hyperplasia, densification, mineralization, and dehydration of the implant site;"

(g) "Implant—capsule—oil adjuvant interactions leading to tissue degeneration or denaturation," producing antigens that elicit antibodies causing autoimmune disturbances;

(h) "Pathologic effects from bacterial, viral, or fungal colonization ..." leading to chronic infections or toxic phenomena;

(i) "infection, seromas, and hematomas" accelerate and intensify "implant adverse reactions and related diseases;"

(j) "Atypical infection may be a primary factor leading to systemic effects;"

(k) Saline and double lumen implants harbor micro-organisms which lead to systemic symptoms;

(l) "infective and immunological phenomena;"

(m) Intracapsular infections enhance capsular fibrosis;

(n) "Health effects associated with chronic low grade infections and microbiological metabolites such as toxins may account for some of the disturbances;"

(o) Disease process continues after the removal of implants;

(p) Early encapsulation and leakage of oil from the implant and "related chemical debris" produces "bioactive mixtures of silicone compounds with dispersions of denatured proteins;"

(q) Bacterial contamination even in the presence of systemic antibiotics;

(r) Antibodies directed against autogenous tissue antigens "create rheumatoid-like and other degenerative tissue disease symptoms;"

(s) "Intracapsular and pericapsular mineralization (calcification)" is a primary consequence of tissue necrosis.

(Blais reports, Exhibit 11 to Plaintiffs' July 15, 1997 Opposition to Defendants' Science Brief). Although Plaintiffs' counsel represented at the September 3, 1997 hearing that Dr. Blais would not testify about general causation, his reports contain numerous statements about breast implants causing a variety of injuries.

Dr. Blais founded his consulting company, Innoval, in 1989. Innoval is "a barebones implant and material retrieval system." (See Exhibit C to Defendants' Motion in Limine to Exclude Expert Testimony of Pierre Blais). Dr. Blais has testified that Innoval is a corporation and/or a trade name under which Dr. Blais does business. (Id., Exhibit B pp. 98–99, Exhibit G p. 644, Exhibit K p. 359). Innoval also employs Blais' wife and son and, as of 1995, two nurses. Blais is the only chemist on staff. Innoval has never had any doctors on staff. (Id., Exhibit B, Exhibit F p. 411, Exhibit G, Exhibit K p. 404). Innoval's facilities consist solely of Blais' house in Ottawa. (Id., Exhibit C p. 89, Exhibit G p. 555).

As to Dr. Blais' opinions concerning the causes and mechanisms of disease, although Plaintiffs represent that Dr. Blais will not testify about medical issues, his reports are rife with conclusions about medical issues. Dr. Blais claims expertise in both pathology and toxicology, but concedes he has no for-

mal training in medicine, pathology, toxicology, immunology, epidemiology, or engineering. (*Id.* Exhibits F, G). Blais' asserted expertise in biomaterials does not make him qualified in the many areas of medical science in which he opines.

Dr. Blais did not examine Plaintiffs Zelinger or Roberts or their implants. As the basis for his opinions concerning the condition of the implants, Dr. Blais relies on Dr. Guidoin's photographs and reported observations of the implants as contained within Dr. Guidoin's reports. Dr. Blais' reports appear to be written on forms with attached form appendices depending on the manufacturer and model of the implant. (*See e.g.* App. C in Roberts and Zelinger reports).

Dr. Blais' reports cite some limited scientific literature to support his opinions: Copeland, M. et al., "Systemic Inflammatory Disorder Related to Fibrous Breast Capsules after Silicone Implant Removal"; *Plastic and Reconstructive Surgery,* 92(6) 1179–1181 (1993) (the alleged risks of reimplantation without removal of the existing capsule tissue, which is not at issue here) (*see* Roberts report, App. D, p. 13); "LeVier and Boley studies on adjuvant effects of silicone compounds" (1974) and "Lake and Redonovich studies on pharmacology of silicone derivatives" (1975) (*See* Roberts report App. C, p. 11 and Zelinger report App. C, p. 8). These articles were internal reports, not published in the peer reviewed literature, and do not specifically support Blais' opinions in these two cases.

Plaintiffs have submitted several journal articles and other documents in conjunction with Blais' reports. Nowhere does Dr. Blais specifically rely on these documents or the information contained therein. Nor do the documents support Dr. Blais' opinions. *See* Naim, J., et al., "The Effect of Molecular Weight and Gel Preparation on Humoral Adjuvancy of Silicone Oils and Silicone Gels," *Immunological Investigations* 24(3), 537–547 (1995) ("results show humoral adjuvancy of silicone oil is dependent on molecular size and that differential shearing of the silicone gel does not alter its humoral adjuvancy");

Brinton, Louis, et al., "Epidemiological Follow–Up Studies of Breast Augmentation Patients," *J. Clinical Epidemiol,* Vol. 48 No. 4 pp. 557–63 (1995) ("[a] variety of different approaches are currently underway to assess the long-term effects of cosmetic breast implants. Both cancer and connective tissue disease outcomes are being addressed in these studies"); [8] Dept. Health & Human Services, "Questions and Answers about the National Institutes of Health Followup Study of Women with Augmentation Mammoplasty" (a "guide developed to address concerns and dispel misconceptions about the study"); Narini, Philip P., M.D., et al., "Repeated Exposure to Silicone Gel Can Induce Delayed Hypersensitivity," (no journal cited) (the "data suggest that it may be possible to induce an antigen-specific lymphocyte-mediated response to silicone gel"); LeBeau, Joseph E. and Gorzinski, Stanley J., "Dimethylpolysiloxane Fluid ...," (no journal cited) (study in rats of migration of silicone fluid from site of subcutaneous injection); May 16, 1958 Report to General Electric Company (study of excretion of silicone oil fed to rats); Lacefield, Ruth M., et al., "Biological Distribution of Dimethylpolysiloxane (Restricted Report)" (compared effect in mice of an oral dose with subcutaneous injection of dimethylpolysiloxane fluids); Luu H., M.D., "Characterization of Polyesterurethane Degradation Products," *Journal of Applied Biomaterials,* Vol. 5, 1–7 (1994) (mechanism and products of microthane foam degradation) [9] (Journal Article/Documents, Exhibit 11 to Plaintiffs' July 15, 1997 Opposition to Defendants' Science Brief). Dr. Blais' *curriculum vitae* lists eight "Typical Publications," six of which are not on the subject of breast implants. Of the two items on the subject of breast implants, one is a "Letter to the Editor." It is not clear whether the other item was in writing or was an oral presentation.

Dr. Blais' hypotheses concerning cause of disease, mechanisms of disease, and the effect of silicone in the body have not been tested, nor have they been published in the peer reviewed literature. Neither Dr. Blais nor others have tested his theories. No pub-

---

**8.** These Plaintiffs do not make any cancer claims.

**9.** Plaintiffs' expert reports do not indicate the presence of polyesterurethane foam in Plaintiffs' implants.

lication of Dr. Blais' hypotheses, methodology or opinions exists in the peer reviewed literature. Dr. Blais concedes that he does not publish. (Exhibit C p. 189 to Defendant's Motion in Limine re: Blais).

Plaintiffs have not demonstrated that Dr. Blais' methodology or opinions are generally accepted in the scientific community. To the contrary, the accepted method for determining the cause of disease is epidemiology and, if necessary, the Bradford Hill criteria. The substantial body of epidemiology demonstrates no valid association between silicone breast implants and disease. Dr. Blais responds to the epidemiology by stating that "no other scientists [are] interested in this area." (*Id.*, Exhibit A p. 53). The theories offered by Dr. Blais are not supported by generally accepted scientific data.

Dr. Blais has not applied any definable scientific methodology, much less a generally accepted methodology, to reach his opinions. He states that his opinions are based upon a "general method for investigative work surrounding physical objects," a generic explanation that defies examination. Dr. Blais has no measured or quantitative data to support his opinions. Dr. Blais' opinions amount to nothing more than subjective opinions.

■ Dr. Blais' opinions are also challenged because they were developed for litigation purposes and demonstrate extraordinary bias and disregard of scientific methods. Dr. Blais' opinions have either a high or an undetermined rate of error. (*Id.* Exhibit A p. 18, Exhibit L pp. 20–21). Dr. Blais' opinions are not developed independent of litigation. In fact, the vast majority of Innoval's business comes from plaintiffs involved in breast implant litigation. (*Id.* Exhibit F p. 45). Whether or not testimony is biased and unreliable because it was developed solely for litigation purposes is an important factor in determining the admissibility of evidence. *Daubert*, 43 F.3d at 1317; *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1234 (5th Cir.1986). This factor provides an additional reason for excluding Dr. Blais' testimony here.

■ The court concludes, pursuant to Rule 702, that Dr. Blais is not qualified by knowledge, skill, experience, training, or education to testify about medical issues such as the presence of disease, the mechanism of disease, the causes of disease, or what occurs in the human body in response to the presence of a breast implant. His opinions concerning cause of disease, mechanisms of disease, and the effect of silicone in the body are not reliable. Dr. Blais did not employ any scientific methodology to reach his opinions, and Plaintiffs have offered no independent validation of the methodology he used to reach his opinions. *See Cabrera v. Cordis Corp.*, 945 F.Supp. 209, 214 (D.Nev.1996). Nor has there been any showing that the information, whatever it may be, that Dr. Blais relied upon in forming his opinions is normally relied upon by experts in the field, as required by Rule 703.

■ As to his opinions concerning implant design, manufacturing, marketing and labeling, Dr. Blais is a chemist with no experience in the design, manufacturing, marketing, or labeling of silicone breast implants and lacks the qualifications to opine about these subjects. Dr. Blais' reports fail to disclose any specific opinion about defect in design, manufacture, marketing or labeling of the Plaintiffs' breast implants. Dr. Blais has never worked at or even been to a plant that manufactures implants. His reports are devoid of any information of the lot histories of the Plaintiffs' implants. He represents that he has reviewed company documents but does not possess such documents and cannot say precisely what he reviewed. As a chemist, Dr. Blais is not automatically qualified to address the product liability issues of manufacturing, design, marketing, or labeling of silicone breast implants. He opines that the Plaintiffs' implants were defective without mentioning any specific defect. No basis for any opinion about defect is revealed in the reports.

The court finds that Dr. Blais' opinion testimony cannot survive the tests of Rules 702, 703, *Daubert*, 509 U.S. at 579, 113 S.Ct. 2786, or its progeny. Under the considerations enumerated in *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786, as well as other considerations, Dr. Blais' opinions do not meet the standards of scientific reliability that would permit them to be presented to the jury.

This court is not the first to make the assessment that Dr. Blais' opinion testimony

is inadmissible. *See Johnson v. Baxter*, No. CV–92–07501 at 4, Second Judicial District Court, New Mexico (Feb. 23, 1998) ("Dr. Blais is a troubling witness ... it appears that Dr. Blais is so biased it affects his objectivity and his ability to give an honest opinion. Notwithstanding this problem, Dr. Blais' theories as to breast implants in general are totally unscientific and therefore unreliable... He will not be allowed to give general opinions on the manufacture or design of implants, any immunological effects or responses, nor the issues of implant failure"); *Cabrera*, 945 F.Supp. at 214 (Dr. Blais' opinion testimony was excluded because it was not supported by studies, scientific data, scientific literature, scientific testing, peer review, or general acceptance in the scientific community), *aff'd*, 134 F.3d 1418 (9th Cir. 1998); *Bailey v. Dow Corning Corp. et al.*, Cause No. 94–1199–A, 1996 WL 937659, District Court of Dallas County, Texas, 14th Judicial District (1996); *Wilson v. Guichon*, B.C.Sup.Ct. Nos. C863922 and C865281 at 34–35, B.C.J. No. 1812 (Aug. 7, 1990), *appeal dismissed*, 76 B.C.L.R. at 191 (C.A.) (excerpted at Exhibit J to Defendants' Motion in Limine to Exclude Expert Testimony of Pierre Blais) ("in advancing his cause against the Meme implant, and in giving evidence at trial, Dr. Blais set aside the mantle of the scientist and replaced it with that of the zealot... In many respects his evidence was not the objective and unbiased evidence which the Court expects of, and requires from, a scientist, an expert. It was instead so obviously biased that in most respects it is of little value to the Court ... such that I do not believe that it would be safe to accept it unless corroborated by other evidence").

### III. Conclusion

Pursuant to Rules 702, and 703 of the Federal Rules of Evidence, and as outlined in *Daubert*, 509 U.S. at 579, 113 S.Ct. 2786, and its progeny, Plaintiffs Zelinger and Roberts, as the proponents of the expert testimony, have failed to meet their burden of proof of establishing that the opinions of Drs. Kassan, Klapper, Hoffman, Guidoin, and Blais: (1) are based on valid, scientific principles and reliable scientific methods, processes, reasoning, and data; (2) are based upon data reasonably relied upon by experts in the field, and (3) would assist the trier of fact in resolving a factual dispute in these actions. The testimony of these witnesses must be excluded as follows.

Accordingly, IT IS ORDERED:

1. Defendants' Motion to Exclude General Causation Testimony (filed June 2, 1997) is GRANTED;

2. Defendants' Motion In Limine to Exclude Expert Testimony of Stuart Kassan, M.D. (filed June 2, 1997) is GRANTED;

3. Defendants' Motion In Limine to Exclude Expert Testimony of Jack A. Klapper, M.D. (filed June 2, 1997) is GRANTED;

4. Defendants' Motion In Limine to Exclude Expert Testimony of Daniel Hoffman, M.D. (filed June 2, 1997) is GRANTED;

5. Defendants' Motion In Limine to Exclude Expert Testimony of Robert Guidoin, Ph.D. (filed June 2, 1997) is GRANTED IN PART;

6. Defendants' Motion In Limine to Exclude Expert Testimony of Pierre Blais, Ph.D. (filed June 2, 1997) is GRANTED.