Nannette Louise GRANT and Timothy
Lawrence Grant, Plaintiff,

v.

BRISTOL–MYERS SQUIBB,
et al., Defendants.

No. CIV 93–1275–PHX–RGS.

United States District Court,
D. Arizona.

April 3, 2000.

Elliot G. Wolfe, Daniel Jay Adelman, Serena C. Montague, Begam Lewis Marks Wolf, Phoenix, AZ, for Nannette Louis Grant, Timothy Lawrence Grant.

Sheila Carmody, Merton E. Marks, Robert Glen Fisher, Lewis & Roca LLP, Phoenix, AZ, Michael F. Healy, Sedgwick Detert Moran & Arnold, San Francisco, CA, Nathan Alan Schachtman, McCarter & English LLP, Philadelphia, PA, for Bristol–Myers Squibb Co., Medical Engineering Corp., Surgitek, Inc.

Janet E. Kornblatt, Cavanagh Law Firm, PA, Phoenix, AZ, John H. Westover, Westover & Westover, Phoenix, AZ, for Dow Corning Corp., Dow corning Wright Corp.

## ORDER

STRAND, District Judge.

Pending before the Court are Defendants' Motions in Limine to Exclude the Testimony of Plaintiffs' Experts Dr. Gary Solomon [Doc. # 57]; Dr. David Goldsmith [Doc. # 59]; Dr. Christopher Batich [Doc. # 61]; Dr. Pierre Blais [Doc. # 63]; Dr. Saul Puszkin [Doc. # 65]; and Dr. Douglas Shanklin [Doc. # 67]. Also before the Court are Defendants' Motion for Partial Summary Judgment re: Lack of Scientific Causation [Doc. # 51], and Motion for Summary Judgment on Plaintiffs' Punitive Damages Claim [Doc. # 55]. The Court heard oral argument on March 15, 2000, and upon consideration of the briefs and the record as a whole, now concludes as follows:

## I. Background

Plaintiff Nannette Louise Grant was implanted with Surgitek bi-lumen silicone gel-filled breast implants on June 25, 1984. The first implants were removed and replaced on April 19, 1985 with Surgitek bi-lumen silicone gel filled implants. Plaintiff then had those implants removed on June 2, 1993, and they were not replaced. Plaintiff claims that her implants cause her to develop severe health problems, including, but not limited to, chronic fatigue syndrome, breast pain, depression, and dry mouth and eyes.

Plaintiff and her husband allege causes of action for strict liability, negligence, failure to warn, breach of express and implied warranties, breach of warranty of fitness for a particular purpose, breach of UCC, misrepresentation, fraud by concealment, false advertising, negligence per se, res ipsa loquitur, negligent infliction of emotional distress, negligent supervision, corporate negligence/vicarious and/or alter ego liability. Plaintiffs seek general and special damages, including attorneys' fees and punitive damages.

## II. Daubert Standard

Defendants' Motions In Limine seek to exclude at trial the testimony of the Grants' proposed expert witnesses Solomon, Goldsmith, Batich, Blais, Puszkin, and Shanklin. Defendants' motions challenge the reliability and relevance of these experts' proffered testimony regarding a causal connection between silicone gel breast implants and systemic diseases.

The Federal Rules of Evidence govern the admission of expert scientific testimony in a federal trial. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 of the Federal Rules of Evidence provides that " ... If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Daubert and F.R.E. 702 require the trial court act as a "gatekeeper," so that the court is satisfied that the proffered expert scientific testimony meets certain standards of reliability before it is admitted. *Daubert*, 509 U.S. at 595–97, 113 S.Ct. at 2798.

The *Daubert* Court listed four non-exclusive factors the trial court is to consider in determining whether an expert's testimony is based on reliable scientific knowledge: (1) whether the theory or method employed by the expert has gained general acceptance in the relevant scientific community; (2) whether the method has been subject to peer-review and publication; (3) whether the method employed can be and has been tested; and (4) whether the known or potential rate of error and the existence and maintenance of standards controlling the technique are acceptable. *Id.* at 591–95, 113 S.Ct. at 2796–97. The four factors enumerated are illustrative rather than exhaustive, and may not be equally applicable in every case. The Ninth Circuit Court of Appeals provided the following additional guidance to trial courts:

One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an experts testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office. (Footnote omitted.) *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995).

The proponents of the evidence have the burden of proving that their expert witness testimony is admissible pursuant to Rule 702 and the Daubert standards. *Daubert*, 43 F.3d at 1311, 1316 (9th Cir. 1995). The proponents do not have to show that testimony is scientifically correct, but just that the methodology used was reliable under Daubert's standards.

### III. Discussion

■ Causation must be general and specific; the plaintiff must prove that the allegedly toxic substance is capable of causing a particular injury in the general population, and that the substance caused this particular individual's injury. *See In re Breast Implant Litigation*, 11 F.Supp. 2d 1217 (D.Colo.1998). Plaintiffs allege that both local and systemic injuries were caused by the silicone breast implants. Whereas the local disease might be characterized by symptoms such as breast pain or mastitis, a systemic disease might manifest for example, as cancer, lupus, or a connective tissue disease. Some of Plaintiffs experts opine that a new undifferentiated atypical disease/syndrome is associated with exposure to silicone in the silicone gel implants. This theory sets forth various kinds of atypical connective tissue diseases, which allegedly manifests through a constellation of symptoms and are caused by an autoimmune response to silicone in breast implants. Several areas of scientific study are implicated by these theories of systemic injury such as immunology, toxicology, rheumatology, and epidemiology, the study of the causes of diseases in humans.

To support their motions to exclude testimony of systemic injury under Daubert, and to support their motion for partial summary judgment re: scientific causation, Defendants presented the reports of court-appointed and congressional appointed committees who have concluded that silicone breast implants are not associated with systemic illness. One of the two main reports presented and reviewed by this Court arose of out the Multi district Breast Implant Litigation 926. Those cases were assigned to transferee Chief Judge Sam C. Pointer, from the northern district of Alabama, to handle pretrial discovery and simplify issues for trial. Judge Pointer appointed a national committee of experts under Federal Rule of Evidence 706, deemed the National Science Panel (NSP), to consider evidence on whether silicone breast implants cause systemic disease and to assist Judge Pointer in making evidentiary rulings concerning whether there was a causal link between breast implants and any of the individual connective tissue diseases, all definitive connective tissues diseases combined, or other autoimmune/rheumatic conditions.

Four experts were appointed to the NSP: an epidemiologist (Dr. Barbara Hulka), an immunologist and rheumatologist (Dr. Betty Diamond); a rheumatologist and epedimiologist (Dr. Peter Tugwell), and a toxicologist (Dr. Nancy Kerkvliet). For over two years, the NSP considered the alleged causal relationship between disease and silicone breast implants with plaintiffs and defendants each providing the top forty articles in each field supporting their position. In November 1998, the Panel issued its report entitled "Silicone Breast Implants in Relation to Connective Tissue Diseases and Immunologic Dsyfunction." The executive summary of that Panel reported their conclusion that "[n]o association was evident between breast implants and any of the individual connective tissue diseases, all definite connective tissue diseases combined, or the other autoimmune/rheumatic conditions." [See Exhibit 35 to DF's Motion re: scientific causation; See Report at p. 6]. The Panel also found no association between breast implants and atypical connective tissue diseases or any distinctive constellation of symptoms observed in women with breast implants. [See id at p. 7]. Panelists noted that their findings and conclusions were unanimous, and that "a large majority of scientists in our respective disciplines

would find merit on our reviews and analysis."

Defendants also direct the Court's attention to a study on the safety of silicone breast implants sponsored by the U.S. Department of Health and Human Services. In June of 1999, the Institute of Medicine of the National Academy of Sciences concluded that there is insufficient evidence to support allegations that breast implants are associated with defined connective tissues disease, cancer, neurological diseases or undefined, atypical syndromes. [See IOM's executive summary at pp 2–7; Ex. 40 to partial summary judgment motion]. In fact, the IOM Committee asserted that "given repeated findings of no elevated risk, the evidence supports the conclusion that there is no association, and therefore no justification for the use of resources in further epidemiological exploration of such an association." [IOM Report at p. 175].

To further support their contention that breast implants do not cause systemic disease, Defendants point out that more than twenty epidemiological studies that have been published in peer review articles have concluded that breast implants do not cause any diseases, typical or atypical. [See Reply in Support of Motion to Exclude Testimony of Solomon, p. 3]. As evidence that this conclusion is accepted as fact by the scientific community, Defendants also submit as exhibits the statements of twenty national and international medical and scientific organizations, including the American Medical Association and the American Cancer Society, who have issued statements relating to the absence of scientifically reliable evidence linking breast implants to disease. [See Exs. 10–30 of Defendants' motion re: causation].

Further, many district and appellate courts have considered the same issues that are currently before this Court and some have held extensive evidentiary hearings. In *In Re Breast Implant Cases*, 942 F.Supp. 958 (S.D.N.Y.1996), three New York district judges and a magistrate held a hearing on behalf of all plaintiffs and defendants in pending and projected cases, and heard many witnesses and received in evidence documents and scientific papers, and incorporated those from breast implant cases in other district courts.

Although the southern district of New York court panelists deferred a ruling because the Daubert issue had not been briefed prior to the hearing, the Court stated that the evidence presented by the parties "supports the conclusion that the silicone implants at issue do not cause classical recognized diseases such as interstitial pulmonary fibrosis, systemic lupus erythematosus, rheumatoid arthritis, or Sjogren's Syndrome. *Id.* at 961. Experts also agreed that the breast implants did not exacerbate classic rheumatology or connective tissue diseases." *Id.* As for any proffered atypical disease theory, the Court found that "[T]he hundreds of symptoms associated with this undifferentiated disease, the lack of any acceptable agreed upon definition, the inadequacy of any satisfactory supporting epidemiological or animal studies, the lack of a scientifically acceptable showing of medical plausibility, and the questionable nature of the clinical conclusions of treating doctors, all point to a failure of proof in making a prima facie case that silicone implants cause any of the syndromes claimed except for local disease." *Id.*

The District of Colorado in *In re Breast Implant Litigation*, 11 F.Supp.2d 1217 (D.Colo.1998), recently found that proffered testimony related to systemic diseases from which breast implant recipients allegedly suffered was not admissible under Daubert. The Order in that case explained the import of epidemiological studies. Relying heavily upon the epidemiological studies as the "best evidence of causation in the mass torts context," that court noted that if the available body of epidemiology demonstrates that risk is not doubled, then causation evidence is inadmissible. *Id.* at 1225. The court further noted that seventeen epidemiological stud-

ies of breast implants had been published in peer reviewed medical journals, and that each controlled study demonstrated that breast implants do not double the risk of a known disease. *Id.* at 1226–27. The Colorado district court additionally deemed that the atypical disease was without definition and so could not be well examined by a controlled epidemiological study. *Id.* at 1227. Finding plaintiffs to be lacking in reliable scientific evidence of causation, the Court disallowed the plaintiff's proffered expert testimony. *Id.* at 1228, 1236–44.

Plaintiffs intend to introduce the testimony of Drs. Solomon, Batich Blais; Puszkin; and Shanklin.[1] Plaintiffs argue that their experts are qualified and use methods that are acceptable and reliable. As such, they request that the Court find expert testimony admissible and allow a jury to ascertain the weight of the evidence. The proffered experts are as follows:

Dr. Puszkin holds a Ph.D. in neuroscience and has worked in the fields of pathology and immunology for more than twenty years. In Plaintiffs' Opposition to Motion to Exclude, they advised that he would testify in this case that silicone causes pathological complications and disease, and as to immunological reactions to silicone molecules when they migrate from a defective silicone breast implant. [see Plaintiffs' Opposition to Motion to Exclude re: Puszkin at pp 14–15]. At oral argument, Plaintiffs clarified that Puskzin would not testify as to systemic disease, but would solely testify as to his reading of the pathology slides under the microscope. Puszkin's proposed testimony then is not subject to this Daubert challenge directed at proposed systemic disease testimony, and the motion in limine will be denied as moot. Whether Puszkin's testimony would be helpful to trier of fact as to local disease. is not before the Court at this time.

Dr. Blais holds a PhD in physical chemistry. At the hearing, Plaintiffs advised that Blais was expected to testify as to structural integrity and biomedical sciences. In their response brief, they state that his testimony will include "his knowledge and expertise with silicone gel filled breast implants" and well as other knowledge gained while working for the implant manufacturer.

Many other courts have excluded Blais' opinion on the alleged defect of implants finding it unreliable and not accepted in the general scientific community as to systemic injury caused by silicone breast implants. This Court agrees that Blais is not a medical doctor and has not supported his theories with testing. Further, Blais did not develop his opinions independent of litigation. As such, Blais may not testify as to any opinion he may have as to defects of breast implants or any other topic that is beyond his qualifications as a chemist.

Dr. Shanklin, a pathologist, and Dr. Solomon, a rheumatologist, both were expected to testify about a systemic silicone associated disease. Based on the foregoing discussion, and the fact that neither Shanklin nor Solomon have ever examined Plaintiff, or in Shanklin's case, even reviewed her medical records, the Court finds that their theories are based on their own opinions, and are not generally accepted by scientific community. Differential and clinical studies do not suffice for Daubert standards. Therefore, Solomon and Shanklin's testimony will be excluded.

Dr. Batich, a biomaterials expert, is expected to testify regarding his opinions on bioplausibility, specifically that silicone migrates outside the breast capsule and that silicone degrades into silica in the body, thereby making the siloxics biologically reactive in humans. Plaintiffs have not presented sufficient evidence of Dr.

---

1. Plaintiffs did not respond to the Motion in Limine to Exclude Dr. David Goldsmith in writing or during oral argument. As such, the Court presumes there is no opposition and will grant that motion without further discussion. [doc. # 59].

Batich's qualifications, nor evidence that his theories are generally accepted in the scientific community. His testimony will be excluded.

■ As a whole, the Court finds that the evidence regarding systemic disease as proposed by Plaintiffs' experts is not scientifically valid and therefore will not assist the trier of fact. As for the atypical syndrome that is suggested, where experts propose that breast implants cause a disease but cannot specify the criteria for diagnosing the disease, it is incapable of epidemiological testing. This renders the experts' methods insufficiently reliable to help the jury.

■ Further, there is overwhelming evidence to the contrary. In all of the epidemiological studies, there is no associated increasing incidence of disease with increased exposure to the agent. Defendants point out that all twenty plus epidemiological studies to date have found that the relative risk factor around 1.0, or no association, [See Defendants' Reply re: motion on causation at p. 9], and submitted several affidavits supporting that contention. [See, e.g., Ex. 1: Dr. Ory affidavit at ¶¶ 25–34; Ex. 2: Dr. Schlesselman affidavit ¶¶ 32–40]. The Ninth Circuit noted in Daubert that studies showing a relative risk less than 2.0 would not be helpful, and indeed would only serve to confuse the jury, if offered to prove rather than refute causation. 43 F.3d 1311, 1320. See also Brock v. Merrell Dow, 874 F.2d 307 (5th Cir.1989) (epidemiological studies with lower end confidence intervals less than one are not reasonably relied upon by experts to form opinions about causation).

Plaintiffs argue that this court should focus on methodology and not conclusions. However, the Supreme Court has noted that:

> "conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data, But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion testimony which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great of an analytical gap between the data and the opinion proffered."

General Electric Company v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997).

This Court finds that Plaintiffs' experts conclusions about systemic disease have not gained acceptance in the relevant scientific community and none of the proffered experts demonstrated that scientific methods practiced by a recognized minority in the field were followed. There is no explanation of why these opinions should outweigh the over twenty epidemiological studies finding no valid risk of autoimmune disease resulting from breast implants in humans. The Court will not allow the jury to speculate based on any experts' opinion based only on clinical experience in the absence of evidence showing consistent, statistically significant association between breast implants and systemic disease.

Summary judgment is appropriate "in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true." Daubert, 509 U.S. at 596, 113 S.Ct. 2786. Recently in Allison v. McGhan Medical Corp., 184 F.3d 1300 (11th Cir.1999), the Eleventh Circuit, affirmed a district court's exclusion of testimony regarding systemic disease and silicone breast implants. The appellate court noted that "[W]hile we acknowledge that the debate regarding systemic disease and silicone products may be ongoing for years to come, we concur with the district court that final summary judgment is appropriate at this time and with these experts."

Likewise in this case, Plaintiffs lack reliable scientific evidence to support causation between breast implants and systemic disease. Thus, Plaintiffs cannot prove that

Nannette Grant's injuries were more likely than not caused by exposure to the silicone breast implants. Accordingly, Defendants' motion for partial summary judgment will be granted as to scientific causation on systemic disease.

Because claims related to systemic injury will be dismissed, there will be no punitive damages allowed as to those claims. Without a showing of causation, there can be no showing that Defendant's acts were outrageous in causing harm to Plaintiffs.

Based on the foregoing,

**IT IS ORDERED** granting each of Defendants' Motions in Limine to Exclude the Testimony of Plaintiffs' Experts Dr. Gary Solomon [Doc. # 57]; Dr. David Goldsmith [Doc. # 59]; Dr. Christopher Batich [Doc. # 61]; Dr. Pierre Blais [Doc. # 63]; and Dr. Douglas Shanklin [Doc. # 67].

**FURTHER ORDERED** denying as moot Defendants' Motions in Limine to Exclude the Testimony of Plaintiffs' Expert Dr. Saul Puszkin [Doc. # 65].

**FURTHER ORDERED** granting Defendants' Motion for Partial Summary Judgment re: Lack of Scientific Causation [Doc. # 51].

**FURTHER ORDERED** granting Defendants' Motion for Summary Judgment on Plaintiffs' Punitive Damages Claim [Doc. # 55].